440 A.2d 488

COMMONWEALTH of Pennsylvania

v.

Stanton STORY, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 15, 1981.

Decided Dec. 28, 1981.

Reargument Denied Feb. 5, 1982.

Charles M. Schwartz (Court-appointed), Welsh White, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Deputy Dist. Atty., Dara A. DeCourcy, Asst. Dist. Atty., Pittsburgh, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, KAUFFMAN, and WILKINSON, JJ.

## OPINION

ROBERTS, Justice.

Appellant, Stanton Story, has been tried and convicted in March of 1975 for an offense committed in July of 1974, sentenced pursuant to a death penalty statute declared unconstitutional while his appeal was pending, and granted

a new trial on appeal in January of 1978 because of the prosecution's introduction of improper evidence. He now appeals from a judgment of sentence of death imposed pursuant to the Act of September 13, 1978, P. L. 756, following the retrial. We do not disturb the conviction. However, because we conclude that the Act of September 13, 1978, does not apply, we set aside the sentence of death and impose a sentence of life imprisonment.[1]

## I

Under the statute in effect in July of 1974, when the killing which gave rise to the present prosecution occurred, the Legislature mandated the imposition of the penalty of death where a murder of the first degree was accompanied by any one of nine aggravating circumstances and none of three mitigating circumstances existed. Act of March 26, 1974, P. L. 213, § 3. In March of 1975, appellant was found guilty of murder of the first degree and sentenced to death under this statutory scheme.

In November of 1977, while appellant's appeal was pending, this Court held the Act of 1974 unconstitutional. *Commonwealth v. Moody*, 476 Pa. 223, 382 A.2d 442 (1977), cert. denied, 438 U.S. 914, 98 S.Ct. 3143, 57 L.Ed.2d 1160 (1978). This Court concluded that the statute "so narrowly limits the circumstances which the jury may consider mitigating that it precludes the jury from a constitutionally adequate consideration of the character and record of the defendant."

---

1. This case was reassigned to this writer on Dec. 7, 1981.

   Appellant challenges both the propriety of the sentence of death and the validity of the jury's verdict of murder of the first degree, upon which the sentence of death is based. As to the verdict, appellant contends that he should be granted a new trial because (1) the court improperly admitted the former testimony of two Commonwealth witnesses, (2) the prosecutor improperly argued that the victim's fatal wound was caused by revolver ammunition, (3) the court erred in treating this as a capital case, (4) appellant's right to a jury trial was violated by the for-cause exclusion of veniremen who stated that they would automatically vote against the death penalty, and (5) the Commonwealth improperly exercised its peremptory challenges. We have considered these contentions and, after careful review, conclude that none warrants relief.

476 Pa. at 233, 382 A.2d at 447. The sentence of death imposed in *Moody* was vacated and a sentence of life imprisonment entered.

In January of 1978, this Court determined that appellant's conviction was improperly obtained. *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978). The sentence of death imposed under the unconstitutional death penalty statute was set aside, and a new trial granted.

At appellant's retrial, the prosecution originally planned to seek only a sentence of life imprisonment, the sole remaining constitutional punishment for murder of the first degree in light of *Moody.* However, shortly before the commencement of retrial, the prosecution announced its intention to proceed pursuant to the Act of September 13, 1978, a new death penalty statute. Conviction and sentence of death followed.

## II

That the Legislature did not intend the Act of September 13, 1978, to apply to an offense committed in 1974 is obvious from this Court's interpretation of the Legislature's express mandate that "[n]o statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa.C.S. § 1926.[2] In

2. The prohibition against a retroactive construction of a statute is long-standing. The Statutory Construction Act of 1937 contained the identical prohibition, Act of May 28, 1937, P.L. 1019, § 56, formerly 46 P.S. § 556 (1969), as did our case law as early as 1837. *Oliphant v. Smith,* 6 Watts 449, 451.

Even where the General Assembly intends a retroactive construction, the statute is to be "strictly construed." 1 Pa.C.S. § 1928(b)(2).

In no area is the prohibition against retroactive construction more strongly mandated than in the criminal law. Emphasizing the prohibition contained in the Statutory Construction Act, the act which implements the Crimes Code adds:

"Title 18 of the Consolidated Pennsylvania Statutes (relating to crimes and offenses), as added by this act, does not apply to offenses committed prior to the effective date of this act and prosecutions for such offenses shall be governed by the prior law, which is continued in effect for that purpose, as if this act were not in force. For the purposes of this section, an offense was commit-

a case involving previous Pennsylvania death penalty statutes, Justice Pomeroy stated on behalf of this Court:

"The provisions of [the death penalty statute enacted in 1974] are not applicable to [this] trial because the homicide occurred in the year 1973, long prior to the effective date of the Sentencing Code. In Pennsylvania there is a presumption that statutes are not to have retroactive effect."

*Commonwealth v. McKenna*, 476 Pa. 428, 439–40 n. 13, 383 A.2d 174, 180 n.13 (1978). Like the statute considered in *McKenna*, the Act of September 13, 1978, states only that "[t]his act shall take effect immediately." § 2. Appellant, therefore, is subject to punishment only under the law preceding the newly-enacted statute. Because the previous law governing this case has been declared unconstitutional insofar as it authorizes the death penalty, *Commonwealth v. Moody*, supra, the sole permissible maximum punishment for appellant's crime committed in 1974 is life imprisonment.

Several other jurisdictions share the view expressed by this Court in *McKenna*. California, *People v. Teron*, 22 Cal.2d 103, 151 Cal.Rptr. 633, 588 P.2d 773 (1979), Idaho, *State v. Lindquist*, 99 Idaho 766, 589 P.2d 101 (1979), Illinois, *People v. Hill*, 78 Ill.2d 465, 36 Ill.Dec. 676, 401 N.E.2d 517 (1980), Kentucky, *Hudson v. Commonwealth*, 597 S.W.2d 610 (Ky., 1980), Louisiana, *State v. Collins*, 370 So.2d 533 (La., 1979), and South Carolina, *State v. Rodgers*, 270 S.C. 285, 242 S.E.2d 215 (1978), have all held that, in light of a prohibition against retroactive construction of statutes, a newly-enacted death penalty statute cannot be applied to cases once governed by an unconstitutional statute. Illustrative is the statement of the Supreme Court of Kentucky:

"KRS 446.080(3) clearly and unequivocally states: 'No statute shall be construed to be retroactive, unless expressly so declared.' Nothing in the act of the legislature redefining the crime of murder and adopting the stan-

ted prior to the effective date of this act if any of the elements of the offenses occurred prior thereto."
Act of December 6, 1972, P. L. 1482, § 2. Accord, The Penal Code, Act of June 24, 1939, P. L. 872, § 104, formerly 18 P.S. § 4104 (1963).

dards by which capital punishment may be considered and may be imposed even hints at retroactive application, much less *expressly declares* other than prospective application. 1976 Ky.Acts, Ch. 15, Secs. 1–4 (ex.sess.) The legislature has proclaimed that it will expressly indicate those instances in which an act is retrospective in nature. It has not done so here. Therefore, *statutorily*, the death penalty may only be imposed in those cases in which the crime was committed after the effective date of the revised death penalty statute. Not only is this result required by the statutory rule of construction, it is in accord with the common law of this Commonwealth, unchanged for over a hundred years. *Watts v. Commonwealth*, 78 Ky. (1 J. Rodman) 320 (1880); see *Long v. City of Louisville*, 97 Ky. 364, 30 S.W. 987 (1895); *O'Donoghue v. Akin*, 63 Ky. (2 Duv.) 478 (1866)."

597 S.W.2d at 611. Similarly, the Supreme Court of Louisiana has stated:

"Nowhere in the 1976 capital punishment legislation itself is there any provision which purports to apply the new laws retroactively to crimes which were committed before the legislation's effective date. Therefore, these acts are governed by the original legislative intention that criminal code provisions shall not apply to a crime committed before their effective date, La.R.S. 14–142,[3] and the legislature's express stipulation that no section of the Revised Statutes is retroactive unless expressly so stated. La.R.S. 1:2." [4]

370 So.2d at 534–35. See also R. Kertz & R. Weisberg, "In Mitigation of the Penalty of Death," 69 Calif.L.Rev. 317, 364 (1981).

**3.** [2 in original.] "La.R.S. 14:142 provides: 'This Code shall not apply to any crimes committed before July 29, 1942. Crimes committed before that time shall be governed by the law existing at the time the crime was committed.' "

**4.** [3 in original.] "La.R.S. 1:2 provides: 'No section of the Revised Statutes is retroactive unless it is expressly so stated.' "

## III

The Commonwealth's reliance upon *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), is wholly misplaced. There, the offense had been committed while an unconstitutional death penalty statute was in effect, but the defendant was not brought to trial until after the enactment of a new death penalty statute. Here, the defendant has been tried twice, once under the unconstitutional statute in effect when the offense was committed, and again under a newly-enacted statute.

Under *Dobbert*, this distinction is critical. In *Dobbert*, the defendant argued that, under the equal protection clause, he was entitled to a sentence of life imprisonment like all Florida prisoners who had been sentenced under a former, unconstitutional death penalty statute and then resentenced to life imprisonment. The Court rejected Dobbert's contention on the ground that, unlike those Florida prisoners who had been resentenced, Dobbert had not been brought to trial until after the enactment of the new death penalty statute. According to the Court,

"Florida obviously had to draw the line at some point between those whose cases had progressed sufficiently far in the legal process as to be governed solely by the old statute, with the concomitant unconstitutionality of its death penalty provision, and those whose cases involved acts which could properly subject them to punishment under the new statute. There is nothing irrational about Florida's decision to relegate petitioner to the latter class, since the new statute was in effect at the time of his trial and sentence."

432 U.S. at 301, 97 S.Ct. at 2302.

It cannot be disputed that, had appellant been unsuccessful on his appeal from the conviction underlying the original sentence of death imposed against him, he would have received a sentence of life imprisonment. On every occasion where the conviction has been found to be valid, an appellant facing a death sentence imposed pursuant to an unconstitutional death penalty statute has received a sentence of

life imprisonment.[5] This is so whether or not the appellant has requested relief from the death sentence. *Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174 (1978). In this case, where appellant was successful on his appeal, 476 Pa. 391, 383 A.2d 155 (1978), appellant faced and received the death penalty anew, even though an unconstitutional sentence of death had been imposed on the original conviction.

Whatever rationality can be ascribed to Florida's system of line-drawing in *Dobbert*, there can be no rationality where those appellants who are validly convicted obtain life sentences and only the appellant who was invalidly convicted and is entitled to a new trial remains subject to the death penalty. Both classes of cases, in the words of *Dobbert*, have progressed "sufficiently far in the legal process as to be governed solely by the old statute, with the concomitant unconstitutionality of its death penalty provision .... " Thus, rather than permitting the present death penalty, *Dobbert* forbids it.

The impropriety of the present sentence of death is evident not only from the language of the Supreme Court of the United States in *Dobbert* but also from the case law of the Florida Supreme Court, whose decision was affirmed in *Dobbert*. In *Lee v. State*, 340 So.2d 474 (Fla.1976), the defendant was tried, convicted, and sentenced to death un-

5. See *Commonwealth v. Crowson*, 488 Pa. 537, 412 A.2d 1363 (1979); *Commonwealth v. Edwards*, 488 Pa. 139, 411 A.2d 493 (1979); *Commonwealth v. Sutton*, 485 Pa. 365, 402 A.2d 1005 (1979); *Commonwealth v. Myers*, 481 Pa. 217, 392 A.2d 685 (1978); *Commonwealth v. Davis*, 479 Pa. 274, 388 A.2d 324 (1978); *Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174 (1978); *Commonwealth v. Moody*, 476 Pa. 223, 382 A.2d 442 (1977); *Commonwealth v. Martin*, 465 Pa. 134, 348 A.2d 391 (1975); *Commonwealth v. Dobrolenski*, 460 Pa. 630, 334 A.2d 268 (1975); *Commonwealth v. Coyle*, 460 Pa. 234, 332 A.2d 442 (1975); *Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973); *Commonwealth v. Scoggins*, 451 Pa. 472, 304 A.2d 102 (1973); *Commonwealth v. Raymond*, 451 Pa. 500, 304 A.2d 146 (1973); *Commonwealth v. Mount*, 451 Pa. 582, 300 A.2d 764 (1973); *Commonwealth v. Senk*, 449 Pa. 626, 296 A.2d 526 (1972); *Commonwealth v. Lopinson*, 449 Pa. 33, 296 A.2d 524 (1972); *Commonwealth v. Sharpe*, 449 Pa. 35, 296 A.2d 519 (1972); *Commonwealth v. Ross*, 449 Pa. 103, 296 A.2d 629 (1972); *Commonwealth v. Bradley*, 449 Pa. 19, 295 A.2d 842 (1972).

der an unconstitutional death penalty statute. The original sentence of death was set aside, and the State appealed. While the appeal was pending, all other persons sentenced to death under the unconstitutional statute were resentenced to life imprisonment. However, also while the appeal was pending, the Florida Legislature enacted a new death penalty statute. The Florida Supreme Court initially permitted the State to seek resentencing. 294 So.2d 305 (Fla.1974). However, on the defendant's appeal from the second sentence of death, the court conceded the error of its previous determination, and set aside the sentence of death.

The same conclusion that the Florida Supreme Court reached in *Lee* is required here. Just as in Florida, all those persons who have been sentenced to death in Pennsylvania under unconstitutional death statutes have received life sentences. Because appellant was tried, convicted, and sentenced to death under an unconstitutional statute, he must be treated the same as all those persons whose death penalties have been set aside.

The Commonwealth's effort to diminish the significance of the principles articulated in *Commonwealth v. Littlejohn*, 433 Pa. 336, 250 A.2d 811 (1969), is as misguided as its reliance on *Dobbert*. In *Littlejohn*, this Court held it contrary to due process to subject a defendant to the death penalty on retrial where the defendant originally had been sentenced to life imprisonment. See also *Commonwealth v. Floyd*, 451 Pa. 366, 304 A.2d 131 (1973); *Commonwealth v. Falcone*, 440 Pa. 61, 269 A.2d 669 (1970). Although in *Littlejohn*, unlike here, the defendants did not pursue their appeals, this distinction carries no force under *Littlejohn's* due process analysis. There, as here, "the price exacted for [appellant's] attempt to ensure [his] constitutional right to a fair trial and [his] statutory right to appeal was the risk that on the second trial [he] would receive the death penalty." 433 Pa. at 343, 250 A.2d at 814. Such a price is an impermissible penalty for the exercise of appellate rights.

The Legislature's own canons of statutory construction recognize that a statute must be construed to avoid

unconstitutional results. 1 Pa.C.S. § 1922(3). Where, as here, application of the death penalty statute on retrial would violate equal protection and due process, the statute must be construed not to apply.

## IV

In those instances in which prejudicial error has been committed at the sentencing stage of a capital case, it is this Court's unvarying practice to vacate the sentence of death and impose a sentence of life imprisonment. *Commonwealth v. Alvarado*, 442 Pa. 516, 276 A.2d 526 (1971) (prosecutorial failure to honor plea-bargain); *Commonwealth v. Aljoe*, 420 Pa. 198, 216 A.2d 50 (1966) (prosecutorial misconduct at sentencing hearing). Where, as here, the sentence of death was improperly put before the sentencing jury, the same relief must be granted. As in *Alvarado, Aljoe*, and all of the Pennsylvania cases where the death penalty has been unconstitutionally entered, the sentence of death must be vacated and a sentence of life imprisonment imposed.

Sentence of death vacated and life sentence imposed.

NIX, J., filed a concurring opinion.

LARSEN, J., files a dissenting opinion in which FLAHERTY and KAUFFMAN, JJ., join.

NIX, Justice, concurring.

I agree with the conclusion expressed by Mr. Justice Roberts in his opinion that the sentence of death in this case must be set aside and a life sentence imposed. The sole basis for my conclusion is that the Legislature expressed no intention to apply the Act of September 13, 1978[1] to an offense which occurred in 1974. 1 Pa.C.S. § 1926.

LARSEN, Justice, dissenting.

I dissent from the majority opinion and order which, essentially, is not Constitutionally mandated, ignores the

1. Act of September 13, 1978, P.L. 756, No. 141, § 1, 42 Pa.C.S.A. § 9711.

reasoning and experience of the United States Supreme Court, *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), implicitly overrules this Court's decision in *Commonwealth v. Kalck*, 239 Pa. 533, 87 A. 61 (1913), and exhibits a marked aversion to common sense. Once again, a majority of this Court has seen fit to exalt form over substance through highly technical manipulations of the law, passed off as "interpretations". Moreover, these overly formalistic interpretations strain always, it seems, to favor *only* the interests of the convicted criminal while completely ignoring the countervailing, and equally compelling, interests of the law-abiding citizens of this Commonwealth. This totally one-sided philosophy becomes apparent in considering the obvious incongruity in the following example. On one hand, the majority hold that application of a sentencing procedure enacted in 1978 to a sentencing proceeding which took place in 1979 is retroactive, thus invalidating an otherwise valid death penalty. On the other hand, the same members of that majority have held that court-made procedural rules governing guilty plea proceedings which were adopted in 1974 (*Commonwealth v. Ingram*, 455 Pa. 198, 316 A.2d 77 (1974)) *must* apply to guilty pleas entered in 1973, *e.g., Commonwealth v. Mack*, 466 Pa. 12, 351 A.2d 278 (1976), in 1971, *e.g., Commonwealth v. Minarik*, 493 Pa. 573, 427 A.2d 623 (1981), and in 1970, *e.g., Commonwealth v. Hines*, 496 Pa. 555, 437 A.2d 1180 (1981), thus invalidating otherwise valid guilty pleas. *See Commonwealth v. Minarik*, 493 Pa. 573, 427 A.2d 623 (1981) (opinion of Larsen, J., joined by Flaherty, J. and Kauffman, J.). The inconsistency of these technicalities effectively subordinates the legitimate interests of the people of this Commonwealth in maintaining a fair but firm criminal justice system to the interests of those who have thwarted the aims of that system.

Accordingly, I would submit the following as the opinion of the Court:

Appellant Stanton Story's appeal from his conviction for murder of the first degree and the jury verdict sentencing appellant to death for that crime presents this Court with its

first opportunity to pass upon the constitutionality of the 1978 amendment to the Sentencing Code which completely revised the sentencing procedure for murder of the first degree. 18 Pa.C.S.A. § 1311, Act of September 13, 1978, P.L. 756, No. 141 § 1 [1] The facts of the crime and procedural history of the case are as follows.

On the morning of July 3, 1974, Pittsburgh Police Officers Patrick J. Wallace, Jr. and Kenneth J. Scanlon apprehended one Lafayette Jones in the Homewood-Brushton area of Pittsburgh. Handcuffed, Jones broke away from the officers who gave chase. Officer Scanlon heard a voice shout, "Don't come any closer." Immediately thereafter, shots were fired by a man standing behind a parked car, which man Officer Scanlon identified as appellant, Stanton Story.

Officer Scanlon returned the gunfire as he moved from his position behind a car. Upon returning to the area where he had last seen Patrick Wallace, Officer Scanlon found him lying wounded. Officer Wallace was pronounced dead at Columbia Hospital. The cause of death was a gunshot wound of the chest.

Appellant was tried before a jury in the Court of Common Pleas of Allegheny County and, on March 29, 1975, the jury returned a verdict of guilty of murder of the first degree and imposed the death penalty pursuant to the then-in-effect 18 Pa.C.S.A. § 1311.

Post-verdict motions were denied and a direct appeal was filed with this Court. While the appeal was pending, § 1311 of the Sentencing Code was declared unconstitutional by this Court on November 30, 1977. *Commonwealth v. Moody,* 476 Pa. 223, 382 A.2d 442 (1977).

Subsequently, this Court reversed appellant's conviction on January 26, 1978 and remanded for a new trial. *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978) (judg-

1. Pursuant to § 401(a) of the Act of October 5, 1980, P.L. 693, No. 142, chapter 13 of Title 18 of the Pennsylvania Consolidated Statutes has been transferred to chapter 97 of the Judicial Code; 18 Pa.C.S.A. § 1311, sentencing procedure for murder of the first degree, is now found in 42 Pa.C.S.A. § 9711 (1981 Pamphlet).

ment of sentence reversed due to inadmissibility of photographs of victim's family and oral testimony of victim's widow which evidence was wholly without rational probative value).

On September 13, 1978, the General Assembly enacted a substantially modified statute creating new procedures for imposition of capital punishment for convictions of murder of the first degree.[2] Having been advised of the Commonwealth's intentions to seek the death penalty upon retrial, and after several preliminary procedures not here relevant,[3] appellant was again brought to trial in Allegheny County, the Honorable George H. Ross presiding.[4] Jury selection began on October 17, 1979. Trial began on October 22, 1979 and concluded with a verdict of murder of the first degree on October 26th.

After hearing additional evidence in the second phase of the bifurcated proceeding, the same jury unanimously sentenced Stanton Story to death, having found, in accordance with § 1311(c)(1)(iv), one or more aggravating circumstances which outweighed any mitigating circumstances.[5] The ag-

---

**2.** For convenience, 42 Pa.C.S.A. § 9711, the current provision for sentencing for murder of the first degree, (which consists of the 1978 amendment plus certain 1980 editorial changes in subsections (d)(1) and (e)(5) ), is reprinted in its entirety in the appendix.

**3.** Appellant, through able counsel Charles Schwartz, filed a petition to quash the indictment on double jeopardy grounds. Judge Ross denied this petition which denial was affirmed by this Court on December 29, 1978. Appellant also filed a "Petition to Prevent the Commonwealth from Seeking the Death Penalty." This petition was denied by Judge Ross who then certified the denial order for interlocutory appeal. This court subsequently denied appellant's petition for allowance of appeal on June 7, 1979. There were also pretrial suppression motions and a hearing October 12, 1979.

**4.** Judge Ross is to be commended for his patient, fair and knowledgable handling of all proceedings below.

**5.** Subsection (c) of § 1311 (now 42 Pa.C.S.A § 9711) instructions to jury, provides in part:
   (1) Before the jury retires to consider the sentencing verdict, the court shall instruct the jury on the following matters:
   (i) the aggravating circumstances specified in subsection (d) as to which there is some evidence.

gravating circumstance identified on the verdict slip was "the killing of a police officer while he was on duty."[6] Post-verdict motions were denied on June 20, 1980 and this direct appeal followed.[7]

## I. VALIDITY OF THE CONVICTION OF MURDER OF THE FIRST DEGREE

Initially, appellant raises several issues that go to the validity of the underlying conviction of murder of the first degree. We must resolve these issues before proceeding to those concerning the imposition of the death penalty in this case.

The first two assignments of error are: first, that the lower court erred in admitting certain prior recorded testi-

> (ii) the mitigating circumstances specified in subsection (e) as to which there is some evidence.
> (iii) aggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt; mitigating circumstances must be proved by the defendant by a preponderance of the evidence.
> (iv) the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstances or if the jury unanimously finds one or more aggravating circumstance which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

**6.** Subsection (f) provides:
> (1) After hearing all the evidence and receiving the instructions from the court, the jury shall deliberate and render a sentencing verdict. In rendering the verdict, if the sentence is death, the jury shall set forth in such form as designated by the court the findings upon which the sentence is based.
> (2) Based upon these findings, the jury shall set forth in writing whether the sentence is death of life imprisonment.
> (g) Recording sentencing verdict.—whenever the jury shall agree upon a sentencing verdict, it shall be received and recorded by the court. The court shall therefore impose upon the defendant the sentence fixed by the jury.

The aggravating circumstance designated by the jury was that of § 1311 (d)(1), to-wit: "The victim was a fireman, peace officer or public servant concerned in official detention as defined in 18 Pa.C.S. § 5121 (relating to escape), who was killed in the performance of his duties." Subsection (d) then lists nine other aggravating circumstances. See appendix.

**7.** A sentence of death is subject to automatic review by the Supreme Court. 18 Pa.C.S.A. § 1311(h)(1).

mony of two witnesses taken in the former trial, thereby denying him the right to confrontation guaranteed by the Pennsylvania and United States Constitutions; second, that the lower court erred in allowing the prosecutor to exceed the bounds of permissible comment on the evidence in his closing argument. Having carefully reviewed the record, we find no merit in either of these claims.

Appellant also challenges his conviction on the grounds that the process of "death-qualifying" the jury in selecting jurors from the venire in accordance with *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), renders the jury non-representative on the issue of guilt (i.e., results in a "prosecution-prone" jury). In *Witherspoon v. Illinois, supra,* the United States Supreme Court examined the Illinois procedure for excluding from the jury those veniremen who expressed opposition to the death penalty, and found it wanting. The Illinois practice was to allow the prosecution exclusions for cause of any veniremen who "might hesitate" or who had "qualms" about imposing capital punishment. *Id.,* 391 U.S. at 513, 88 S.Ct. at 1772.

That Court recognized the legitimate state interest in excluding from the jury those prospective jurors who could not follow the trial court's instructions on capital punishment because they could never vote to impose the death penalty or would refuse to even consider it in the case before them. *Id.* 391 U.S. at 513–14, 88 S.Ct. at 1772–73. However, in balancing that legitimate state interest against the competing and equally compelling right of a defendant to be tried by a jury chosen from a group which represents a fair cross-section of the community, the Court held "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* 391 U.S. at 522, 88 S.Ct. at 1776. The legitimate state interest permits the prosecution to exclude veniremen on no broader basis than that they made it "unmistakably clear (1) that they would *automati-*

*cally* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt." Id.,* 391 U.S. at 522–23, n.21, 88 S.Ct. at 1776–77, n.21.[8]

Appellant maintains that his conviction was tainted by an unrepresentative "prosecution-prone" jury caused by the jury selection process. To support his position, appellant relies on the recent California Supreme Court case of *Hovey v. Superior Court of Alamedo County,* 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980) and the numerous studies and statistical surveys cited, and exhaustively analyzed, therein. The United States Supreme Court had left open the question whether the *Witherspoon*-acceptable process of excluding veniremen for sentencing purposes might taint a finding of guilt. The Court referred to the "evidence" on the issue offered by the petitioner, but concluded

The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases risk of conviction. In light of the presently available information, we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was.

391 U.S. at 517–18, 88 S.Ct. at 1774–75. It is appellant's belief that the *Hovey* case, and the data examined therein, answers the question left open in *Witherspoon.* We cannot subscribe to appellant's beliefs.

**8.** Our concern at this stage is merely with appellant's contention that the *Witherspoon* process of "death-qualifying" a jury for sentencing purposes prejudices him at the guilt stage because a jury so composed is less than neutral and favors the prosecution. We will discuss, *infra* appellant's challenge to the validity of the *sentence* because of failure to comply with *Witherspoon* standards.

As the Commonwealth stresses, appellant simply has made no showing on the record that the process of "death-qualifying" a jury tainted the conviction in any way. He offered no evidence at all; instead he relies upon the opinion of the Supreme Court of California and asks us to accept its conclusion that the present *post-Witherspoon* state of scientific/sociological data substantiates his "prosecution-proneness" argument. Appellant states "[t]he conclusions reached by the California Supreme Court in *Hovey* are further supported by studies which have appeared in scholarly journals and are, therefore subject to judicial notice." Brief for appellant at 29. Such a loose concept of "judicial notice" would make a mockery of the adversary system relying on the orderly presentation of evidence to the fact-finder and the opportunity of the opposing party to cross-examine the witnesses, evaluate the evidence and offer its own inferences therefrom, and to present testimony and exhibits contra to that produced by the opponent.

Judicial notice has been described as:

> The act by which a court in conducting a trial, or framing it decision will, of its own motion, and without the production of evidence, recognize the existence and truth of certain facts, having a bearing on the controversy at bar, which, from their nature, are not properly the subject of testimony, or which are universally regarded as established by common notoriety, e. g., the laws of the state, international law, historical events, the constitution and course of nature, main geographical features, etc. The cognizance of certain facts which judges and jurors may properly take and act upon without proof, because they already know them.

Black's Law Dictionary, 5th Ed. The doctrine of judicial notice cannot be invoked to cover evidentiary gaps of a party who has failed to meet a burden of proof. *Graham v. Triangle Publications, Inc.*, 233 F.Supp. 825 (E.D.Pa.1964), *aff'd.* 344 F.2d 775 (3d Cir. 1965). *See also Stone v. New Schiller Bldg., Loan Ass'n.*, 293 Pa. 161, 142 A.2d 293 (1928).

In the instant case, it would be extremely inappropriate for this Court to decide the "*Witherspoon*-prosecution/proneness" argument on the basis of the data discussed in appellant's brief. By failing to introduce evidence to the lower court, appellant has deprived the Commonwealth of an opportunity to raise methodological criticisms to the studies and surveys and to present its own data by way of conflicting studies and expert witnesses. The fact that a record was made on the subject in California is no justification for the failure to make a record in the proceedings herein.

Moreover, even were we to accept the data in *Hovey* as if it had been stipulated to,[9] appellant's argument would still fail. While the California Supreme Court did conclude, after painstaking analysis, that a *Witherspoon*-"death-qualified" jury was not neutral as regards guilt or innocence, it nevertheless rejected the petitioner's argument that his own jury had been shown to be "prosecution-prone". There was a basic flaw in the petitioner's approach.

The post-*Witherspoon* studies focused on a procedure which excluded one out of five categories from the available jury pool: the excluded group was the "automatic life imprisonment" group (would never impose the death penalty given the choice); the included groups were the "oppose death penalty" group (expresses reservations or opposes death penalty generally), the "indifferent" group, the "favor death penalty" group (no qualms), and the "automatic death penalty" group (would always impose death penalty given the choice). *See Hovey v. Superior Court, supra,* at 616 P.2d 1311, 1343–46. Trouble was, the "California-death qualified" jury (i.e., a jury in a capital case qualified under the appropriate California statute) did not contain jurors chosen

---

**9.** Which we emphatically do not. The dictum in the text at this point is merely to assuage our reluctance to dismiss a significant issue in a case of such public importance as this, the first impression case construing the latest attempt by the legislature to enact a constitutionally permissible sentencing procedure for imposing the death penalty. *See Commonwealth v. McKenna,* 476 Pa. 428, 383 A.2d 174 (1978). We in no way, however, withdraw from our usual stance on waiver of issues or failure to make an adequate record in the court below.

from the latter category as the California statute excluded jurors who would automatically vote *for* the death penalty as well as those who would automatically vote *against* it.

Thus, the court agreed with the Attorney General of California when he stated that "petitioner is said to have proved the wrong proposition." *Id.* at 1343. The studies submitted by petitioner therein proved to the *Hovey* court only

> that if a state used all four 'Witherspoon-qualified' groups in a capital trial, the jury would not be neutral. California is not such a state.
>
> .     .     .     .     .
>
> Therefore, until further research is done which makes it possible to draw reliable conclusions about the nonneutrality of "California death-qualified" juries in California, this court does not have a sufficient evidentiary basis on which to bottom a constitutional holding under *Witherspoon* and *Ballew*. It is, indeed, unfortunate that so much research, time, and energy has been expended in this area with the result that no one stopped to consider the differences between a 'Witherspoon-qualified' jury and a 'California death-qualified' jury.

*Id.* at 1346.

In the instant case, review of the record of the selection of jurors from the venire reveals that, as in the *Hovey* case, no juror was selected from the group which would automatically *impose* the death penalty.[10] Accordingly, whatever conclusions the California Supreme Court might have reached from the post-*Witherspoon* data it studied, those conclusions are similarly of insufficient relevance when considering a jury such as the one chosen in appellant's case.

Moreover, appellant was not required to exercise any of his peremptory challenges (17 out of the allotted twenty peremptory challenges were exercised by appellant) to dis-

10. Of the 12 jurors selected, six were in the "neutral" or "indifferent" category (jurors nos. 19, 20, 27, 44, 63 and 76), one was in the "favor death penalty" group (juror no. 39), and five were in the "oppose death penalty" group (jurors nos. 3, 23, 34, 41 and 67).

qualify a juror who would automatically vote for the death penalty. And, while no jurors were removed for cause on that basis, this Court would certainly recognize an exclusion for cause based on a juror's inability to consider life imprisonment when given the choice. If a state has the right to exclude veniremen who have unambiguously said they could not follow the trial court's instructions but would, instead, automatically *reject* the death penalty, then neither our notions of fundamental fairness and due process, nor common sense would deny that right to the defendant where a venireman could not follow the trial court's instructions because he or she would automatically *impose* the death penalty.

Appellant's final argument concerning the validity of the underlying conviction (although it would certainly have a bearing on the validity of the sentence as well) is that Blacks were illegally excluded from the jury (appellant is a Black man) thus denying him due process of law, equal protection and the right to trial by a jury of his peers, as guaranteed by the constitutions of this state and of the United States. The jury venire in this case consisted of 82 persons, of whom five were Black. Of those five, the Commonwealth exercised peremptory challenges to excuse four; the fifth was struck by the Commonwealth for cause.

The issues as framed by the parties were recently addressed by this Court in a case similar in most respects. *Commonwealth v. Futch*, 492 Pa. 359, 424 A.2d 1231 (1981). We will quote at length from that opinion.

The parties agree that "[t]he presumption in any particular case must be that the prosecutor is using the state's [peremptory] challenges to obtain a fair and impartial jury to try the case before the court." *Swain v. Alabama*, 380 U.S. 202, 222, 85 S.Ct. 824, 837, 13 L.Ed.2d 759 (1965). *See also Commonwealth v. Brown*, 490 Pa. 560, 571, 417 A.2d 181, 186 (1980); *Commonwealth v. Martin*, 461 Pa. 289, 297, 336 A.2d 290, 294 (1975). However, the parties disagree as to what burden of proof the defendant must meet to rebut this presumption. The Commonwealth and

appellee Futch urge a different legal standard for this Court to employ in the evaluation of appellee's claim that the prosecution has violated his right to a fair and impartial jury drawn from a representative cross-section of the community . . . The Commonwealth would have us adhere to our past decisions in which this Court has applied the standard enunciated in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). That case presented a Fourteenth Amendment equal protection challenge to the prosecutor's use of the peremptory challenge to exclude black prospective jurors. (Citations omitted.) Appellee Futch, on the other hand, argues that we should not apply the *Swain* standard in the context of an alleged federal and state constitutional violation of the right to a fair and impartial jury. He urges that we apply the less stringent evidentiary standard recently adopted by California and Massachusetts. *See Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, cert. denied, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978). *See also State v. Crespin*, 94 N.M. 486, 612 P.2d 716 (1980); *see generally Mallott v. State*, 608 P.2d 737 (Alaska 1980).

The critical distinction between the *Swain* and *Wheeler-Soares* standards is that under *Wheeler* and *Soares*, a defendant need only prove discriminatory use of the preemptory challenge in the jury selection of his own case, whereas under *Swain*, he must also establish "the prosecutor's systematic use of peremptory challenges against Negroes over a period of time." 380 U.S. at 227, 85 S.Ct. at 839. Here, however, appellee has not established a record which indicates discrimination in the jury selection of his own case, an essential requirement under either standard. *Id.* at 1233–34.

In the instant case as well, appellant has failed to establish that there was a prima facie case of discrimination in the jury selection in his own case. During voir dire, after the last Black venireman was stricken by the prosecutor's peremptory challenge, defense counsel alleged that a prima facie case of discrimination had been established and re-

quested the court to conduct a hearing so that the Common-wealth could attempt to rebut the prima facie showing. Counsel based his motion solely on his perception of a *Wheeler/Soares* trend in the law and therefore offered no *Swain* evidence, i.e., no evidence of systematic exclusion in other cases. (Notes of Testimony, October 19, 1979, 833–36).

The lower court rejected the motion on the basis that *Swain* was still the standard in Pennsylvania and that no prima facie case of systematic exclusion had been made. However, in Judge Ross' opinion denying post-verdict motions, the court found that, contrary to the statement of defense counsel, the exercise of the peremptory challenges *in this case* did not establish a prima facie case of improper motive. An examination of the record indicates the court did not abuse its discretion in so finding. Two of the four Black veniremen excused by peremptory challenge lived in an area near the location of the homicide and stated that they had a recollection of the incident in question.[11] Another was elderly and had difficulty understanding questions asked of her.[12] No reason was offered for the fourth peremptory challenge; thus, there was only one Black venireman excluded without any obvious justification. On the basis of this record, we cannot say the court erred in finding no prima facie case had been established under either *Swain* or *Wheeler/Soares,* and, thus, there was no error in denying appellant's motion for a hearing for the purpose of requiring the Commonwealth to rebut an inference of discrimination. (Parenthetically, we note that the defense exercised 17 of its 20 allotted peremptory challenges; the prosecution exercised 13 of its 20.)

For the foregoing reasons, we affirm the conviction of murder of the first degree.

## II. VALIDITY OF APPLICATION OF THE DEATH PENALTY UNDER 18 Pa.C.S.A. § 1311

Initially, it should be observed that appellant does not challenge the constitutionality of the death penalty *per se* as

11. Juror no. 8, N.T. 453–55 and juror no. 11, N.T. 470.

12. Juror no. 56, N.T. 856–58.

violating the proscription against cruel and unusual punishments of the Eighth Amendment to the United States Constitution, or the proscription against cruel punishments of Article I, § 13 of the Pennsylvania Constitution.[13] Nor does appellant suggest that the sentencing procedures of 18 Pa.C.S.A. § 1311 (now 42 Pa.C.S.A. § 9711) do damage to the constitutional principles condemning capital punishment procedures that are either too rigid (i.e., those that do not permit the sentencing body to consider particular mitigating factors relating both to the crime and to the individual[14]) or too lax (i.e., those that provide inadequate guidelines or unbridled discretion to the sentencing body in making the "life imprisonment vs. death penalty" choice with the result that the death penalty is imposed arbitrarily[15]).

**13.** The United States Supreme Court has, of course, clearly established that "the punishment of death does not invariably violate the Constitution." *Gregg v. Georgia*, 428 U.S. 153, 169, 96 S.Ct. 2909, 2923, 49 L.Ed.2d 859 (1976). While this Court has not made a similar explicit statement about the validity of the death penalty *per se* under Art. 1, § 13, that position is implicit in many of our prior cases. *See, e.g., Commonwealth v. Green*, 396 Pa. 137, 151 A.2d 241 (1959) (death penalty not cruel and unusual punishment under either state or federal constitutions simply because applied to 15 year old defendant, although sentence reduced because lower court failed to consider particularized factors relating to the individual, *not* "from a disinclination against capital punishment") *and Commonwealth v. Howard*, 426 Pa. 305, 231 A.2d 860 (1967) (death penalty not cruel and unusual punishment under either state or federal constitutions merely because defendant had been classified as "mentally ill" with borderline or transient psychosis).

**14.** *See, e.g., Roberts (Harry) v. Louisiana*, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977) (Louisiana statute which provided for mandatory death penalty for first degree murder of police officer but which did not allow consideration of particularized mitigating factors was unconstitutional) *and Commonwealth v. Moody*, 476 Pa. 223, 382 A.2d 442 (1977) (prior version of 18 Pa.C.S.A. § 1311 unconstitutional on ground it too narrowly limited the mitigating circumstances which the sentencing body could consider).

**15.** *See, e.g., Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Georgia statute providing for discretionary sentencing without legislatively defined standards unconstitutional because fraught with dangers of discrimination and arbitrariness) *and Commonwealth v. Bradley*, 449 Pa. 19, 295 A.2d 842 (1972) (same: former Pennsylvania death penalty statute, 18 P.S. § 4701, Act of June 24, 1939, P.L. 872, § 701 *as amended*, struck down in light of

Obviously, it is not an easy task for the legislature to strike a delicate balance and adopt sentencing procedures which give neither too much nor too little discretion to the sentencing body. We believe, however, that the procedures of 18 Pa.C.S.A. § 1311 have deftly made that delicate balance and that the sentencing procedure falls squarely within the controlling guidelines as pronounced by both the United States Supreme Court and this Court. *Compare Commonwealth v. Moody, supra* (former 18 Pa.C.S.A. § 1311 struck down because the three mitigating circumstances which the jury there could consider were insufficient, i.e., there was not enough discretion to consider *all* of the possibly mitigating factors concerning the individual) *and Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) ("we conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death") *with Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (upheld Georgia statutory scheme procedurally quite similar to 18 Pa.C.S.A. § 1311 [16]) *and* 18 Pa.C.S.A. § 1311(d) (aggravating circumstances shall be limited to the ten enumerated situations) and (e) (seven specific mitigating circumstances plus one general circumstance permitting defendant to introduce "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense".)

We turn then to the specific, narrower constitutional objections voiced by appellant to the application of 18 Pa.C. S.A. § 1311 in the instant case. In dealing with these

*Furman*); *see also Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174 (1978).

**16.** The Georgia statute upheld by the United States Supreme Court in *Gregg v. Georgia* is, procedurally, the prototype of 18 Pa.C.S.A. § 1311 in all constitutionally significant respects. *See* description of the Georgia sentencing procedure at 428 U.S. 162–68, 96 S.Ct. 2920–22.

objections, we must be mindful of one overriding fact—it is *the legislature* which has adopted the death penalty as a possible sentence for murder of the first degree in Pennsylvania. In considering such an emotionally charged, controversial and polarizing issue such as the death penalty, the legislature is peculiarly well-adapted to respond to the consensus of the people of this Commonwealth. Regardless of the personal beliefs of any member of this Court, it is manifestly not our function or prerogative to perform as a super-legislature and disturb the determination of the General Assembly absent a demonstration that the legislative enactment *"clearly, palpably* and *plainly* violates" some specific mandate or prohibition of the constitution. *Snider v. Thornburgh,* 496 Pa. 159 at 166, 436 A.2d 593 at 596 (1981), citing *Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 331 A.2d 198 (1975).

In *Snider v. Thornburg, supra,* this Court identified "what is perhaps the most fundamental principle of statutory construction: the presumption that the legislature has acted constitutionally. This presumption 'reflects on the part of the judiciary the respect due to the legislature as a co-equal branch of the government.' *School District of Deer Lakes v. Kane,* 463 Pa. 554, 562, 345 A.2d 658, 662 (1971)." 496 Pa. at 159, 436 A.2d at 596.

So too, in *Gregg v. Georgia, supra* 428 U.S. at 174–76, 96 S.Ct. at 2925–26, the United States Supreme Court instructed:

But, while we have an obligation to insure that constitutional bounds are not overreached, we may not act as judges as we might as legislators.

"Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits. The essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing

between competing political, economic and social pressures." *Dennis v. United States*, 341 U.S. 494, 525, 71 S.Ct. 857, 875, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring in affirmance of judgment).

Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.

This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. "[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." *Furman v. Georgia, supra*, 408 U.S., at 383, 92 S.Ct., at 2800 (Burger, C. J., dissenting).

Accordingly, this Court is constrained from interference with the legislative judgment that the crime of murder of the first degree, coupled with specific aggravating circumstances, is a heinous enough act as to warrant imposition of the death penalty under carefully drafted sentencing procedures, unless appellant can meet his heavy burden of demonstrating the unconstitutionality of 18 Pa.C.S.A. § 1311 in some particular. We proceed, therefore, to appellant's specific constitutional objections.

A. *Ex Post Facto Clause of the Pennsylvania Constitution*

Appellant asserts that application of 18 Pa.C.S.A. § 1311 to his case is an illegal *ex post facto* law under Article 1, § 17 of the Pennsylvania Constitution ("No *ex post facto* law . . . shall be passed.") (As will be seen in this section, the *ex post facto* standards under our constitution are comparable to the standards under the United States Constitution and our interpretations have been consistent with those

of the United States Supreme Court: therefore, references to decisions of the latter Court may be made interchangeably with our decisions). Appellant's theory is as follows: (1) when *Commonwealth v. Moody, supra,* was decided while his appeal was pending, he had a "right" to have his death penalty vacated and to receive a sentence of life imprisonment; (2) at the time of the *Story I* decision (January 26, 1978), he was "subject to no greater punishment than life imprisonment because no constitutional death penalty was then in effect in Pennsylvania"; (3) therefore, application of § 1311 to his case results in an "increase" in his punishment from life imprisonment to death in violation of Art. 1, § 17 as interpreted by *Commonwealth ex rel. Wall v. Smith,* 345 Pa. 512, 29 A.2d 912 (1942) (the *only* case offered by appellant in support of this contention).

While this syllogism is not without a certain abstract, intellectual appeal, upon scrutiny it reveals itself to be pure sophistry, as a perusal of the *ex post facto* cases readily reveal.

In 1913, this Court adopted the *ex post facto* standards set forth by the United States Supreme Court. *Commonwealth v. Kalck,* 239 Pa. 533, 87 A. 61 (1913). In *Kalck,* appellant was convicted on March 1, 1911 of murder of the second degree for a homicide occurring December 19, 1910. Subsequent to the conviction, but prior to her sentencing, the legislature adopted the then-controversial Indeterminate Sentencing Act. Act of June 19, 1911, P.L. 1055. It was there argued that imposing sentence under that Act for a crime committed prior thereto was an *ex post facto* law and, therefore, unconstitutional. This Court unanimously rejected that contention. The Court held, *supra* at 239 Pa. 538, 87 A. 61:

> The probation against the enactment of ex post facto laws in this country was first written into the Constitution of the United States and since that time has been incorporated into the organic law of every state. As far back as 1798, the Supreme Court of the United States in *Calder v. Bull,* 3 Dall. 386 [1 L.Ed. 648], undertook to define the

meaning of an ex post facto law, and that case has remained as a leading authority on the question to the present time. Under that decision ex post facto laws were grouped into four classes, as follows: (1) Every law that makes an act done before the passing of the law, and which was innocent when done, criminal; (2) every law that aggravates a crime, or makes it greater than it was when committed; (3) every law that changes the punishment, and inflicts a greater punishment than the law annexed to the crime, when committed; (4) every law that alters the legal rules of evidence, and requires less or different testimony, than the law required at the time of the commission of the offense, in order to convict.

The appellant in *Kalck* had asserted that the Indeterminate Sentencing Act inflicted greater punishment on her than the law that had been "annexed to her crime" when committed. Since, under Act of 1911, the minimum sentence was indeterminate and was actually fixed by the court at 15 years, and since the prior act limited the minimum sentence to not more than five years, the appellant's minimum sentence was, in fact, greater than that which could have been imposed under the prior act.

However, the Court noted that the determinative factor on the issue of whether "greater punishment" had been inflicted was the *maximum* sentence fixed by the legislature. Under both acts, that maximum remained set at 20 years pursuant to an entirely separate statute (the Act of April 14, 1893, P.L. 17) which had been in force both at the time of the crime and the time of the sentencing. Accordingly, the Court noted that the Indeterminate Sentencing Act

"undertook to regulate, not the law which fixed the punishments, but the sentencing of convicts, and the method of releasing them on parole .... The Act does not fix punishments; it relates exclusively to the manner of sentencing. Both acts expressly recognize as still in force the law fixing maximum punishments .... At the time of the passage of these acts the maximum punishment for

murder of the second degree was twenty years, and this is still the law, and the indefinite term for which sentence is imposed under these acts must be within the maximum limit.

This statutory punishment remains unchanged, but the court is given a discretion in the manner of imposing the sentence, and this was intended to work a substantial benefit to the convicted person as a reward for good conduct.

. . . .

*A statute which mitigates the penalty is not objectionable on the ground of being an ex post facto law, although passed after the crime was committed.* [citations omitted] *So, too, statutes which relate to procedure* or penal administration, or prison discipline, *are not to be considered ex post facto, even though the effect may be to enhance the severity of the punishment.* [citations omitted] Indeed, it may be stated as a general rule, that *no one has a right to insist that particular remedies shall remain unchanged, or that courts and their jurisdiction and the proceedings in them shall continue unaltered,* or that there shall be no departure from established methods in prison discipline or penal administration. Retrospective legislation relating to crimes and punishments may or may not be declared unconstitutional on the ground of being ex post facto. *The question in each case is whether it will increase the punishment, or deprive a party of substantial rights to which he was entitled under the law as it stood at the time the offense was committed.* If the situation is not altered or changed to the disadvantage of the complaining party, the law even if passed after the offense was committed, is not ex post facto as to him.

*Id.* 239 Pa. at 540–43, 87 A. at 61 (emphasis added). Since the Act of 1911 did not fix punishments, but instead related exclusively to the *manner* of sentencing, *id.* 239 Pa. at 540, 87 A. 61, there was no *ex post facto* violation. *See also Commonwealth ex rel. Wall v. Smith, supra; Beazell v. Ohio,* 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925) (similar

standards as in *Kalck*) and *Rooney v. North Dakota*, 196 U.S. 319, 25 S.Ct. 264, 49 L.Ed. 494 (1905) (same).

The United States Supreme Court has recently had occasion to decide the *ex post facto* issue in a case imposing the death penalty pursuant to sentencing procedures adopted after the murder had been committed. *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). The petitioner there committed two grisly murders while a statute was in effect in Florida permitting the death penalty. Prior to arrest and trial, *Furman v. Georgia, supra*, was decided and, pursuant to that decision, the Supreme Court of Florida struck down its 1971 death penalty statute. Late in 1972, the Florida legislature enacted a new death penalty procedure; this statute was upheld in *Proffit v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

Petitioner Dobbert raised several issues concerning the validity of applying the new statute to him. His first argument was that he should have been sentenced under the procedure in effect at the time of his crimes which procedure he viewed as enuring to his benefit. The Court concluded that the changes in the law were *procedural and* on the whole *ameliorative* and that for *either* of these reasons, there was no *ex post facto* violation. *Dobbert v. Florida, supra* 432 U.S. at 292, 97 S.Ct. at 2297. The evil at which the *ex post facto* proscription aims is simply not present when the change is merely *procedural* or where the change was, on the whole, *ameliorative* (even if substantive). The evil is the potential for legislatures to direct "arbitrary and oppressive" legislation at individuals. *Id.* 432 U.S. at 293, 97 S.Ct. at 2298 *citing Malloy v. South Carolina*, 237 U.S. 180, 35 S.Ct. 507, 59 L.Ed. 905 (1915).

In *Dobbert* the Court concluded, 432 U.S. at 293–94, 296–97, 97 S.Ct. at 2298–99, 2299–2300:

> In the case at hand, the change in the statute was clearly procedural. The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime.

. . . .

In this case, not only was the change in the law procedural, it was ameliorative.   It is axiomatic that for a law to be ex *post facto* it must be more onerous than the prior law.

. . . .

[V]iewing the totality of the procedural changes wrought by the new statute, we conclude that the new statute did not work an onerous application of an ex *post facto* change in the law.   Perhaps the ultimate proof of this fact is that this old statute was held to be violative of the United States Constitution in *Donaldson v. Sack*, 265 So.2d 499 (Fla.1972), while the new law was upheld by this Court in *Proffit, supra.*

Dobbert also argued an ex *post facto* violation based on the theory that at the time he committed his atrocities, there was no valid death penalty in effect in *Florida* since the statute in effect at that time was later declared to be unconstitutional.   The court dismissed this contention.

*[T]his sophistic argument mocks the substance of the Ex Post Facto Clause.*   Whether or not the old statute would in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers.   The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder.

Petitioner's *highly technical argument* is at odds with the statement of this Court in *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 374, 60 S.Ct. 317, 318, 84 L.Ed. 329 (1940):

"The courts below have proceeded on the theory that the Act of Congress, having been found to be unconstitutional, was not a law; that it was inoperative, conferring no rights and imposing no duties, and hence affording no basis for the challenged decree.   *Norton v. Shelby County*, 118 U.S. 425, 442, 6 S.Ct. 1121, 1125, 30 L.Ed.

178; *Chicago, I. & L. Ry. Co. v. Hackett,* 228 U.S. 559, 566, 33 S.Ct. 581, 584, 57 L.Ed. 966. It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. *The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored."* Here the existence of the statute served as an "operative fact" to warn the petitioner of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder. This was sufficient compliance with the *ex post facto* provision of the United States Constitution.

*Id.* 432 U.S. at 297–99, 97 S.Ct. at 2300.

Appellant in the instant case is in exactly the same position as was Dobbert. The lower court correctly held that the existence of the death penalty as punishment for first degree murder on July 3, 1974 was an "operative fact" fully advising and warning appellant of the severity of his crime and the intentions of the legislature. When appellant murdered Officer Wallace, our statutes permitted the death penalty for the offense. Appellant was at least constructively on notice that this penalty might indeed follow his brutal actions. The death penalty statute was intended to provide maximum deterrence, and its existence at the time of the crime provided fair warning as to the degree of culpability this Commonwealth ascribed to the act of killing a police officer in the performance of his duties. *Dobbert, supra,* at 297, 97 S.Ct. at 2300.

Appellant was sentenced to death pursuant to the statute in effect at the time of his trial. The only effect of the former statute was to provide sufficient warning of the gravity this Commonwealth attached to first degree murder so as to make application of the new statute to him consistent with the *ex post facto* restraints of the United States and Pennsylvania Constitutions. When appellant was granted a new trial, he quite properly was subjected to the punishment provided for by the statute then in effect,

*Dobbert, supra,* 432 U.S. at 301, 97 S.Ct. at 2302, which was substantively no more harsh than the penalty prescribed for appellant's offense at the time of his crime and imposed at his first trial. *Cf. North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). As the death penalty was in effect at the time of the murder of Officer Wallace, as the changes of the new act were procedural, and as the changes were clearly on the whole ameliorative, there was no *ex post facto* violation in applying 18 Pa.C.S.A. § 1311 to appellant following his conviction upon retrial.

Furthermore, 18 Pa.C.S.A. § 1102, sentence for murder, is the statute which fixes the punishment for murder of the first degree at death or life imprisonment. This provision was in effect at the time Story murdered Patrick Wallace, and was in effect at the time of his sentencing.[17] Thus, as *Kalck* made clear, the changes in sentencing procedure had no effect on the quantum of punishment which had been fixed by 18 Pa.C.S.A. § 1102 at death or life imprisonment which was in effect at all times relevant to these proceedings. Appellant Story is even less affected by the modifications in sentencing procedure than was appellant Kalck: the latter had her minimum sentence *actually* increased from five to 15 years while the former was sentenced to receive the death penalty on both occasions.

Moreover, in *Dobbert,* the United States Supreme Court rejected the argument that equal protection of the laws was denied to petitioner therein by imposition of the death penalty in effect at the time of his trial. The Florida Supreme Court had resentenced to life imprisonment all prisoners under sentence of death pursuant to the death penalty statute which was in effect at the time petitioner committed the acts for which he was tried, but which had

17. *Commonwealth v. McKenna, supra,* decided in 1978 invalidated *application* of 18 Pa.C.S.A. § 1102 because, at that time, there were *no legislative sentencing procedures at all.* The legislature had reenacted § 1102 in the wake of *Moody* for the purpose of clearly providing *some* legislative authority for the imposition of the death penalty and to make their intentions manifest in that regard. As § 1102 left unbridled discretion to the sentencers, it was unconstitutional as applied.

been declared unconstitutional before his trial. Since a new death penalty statute was in effect at the time of petitioner's trial, the United States Supreme Court declared, there was nothing irrational about Florida's decision to relegate petitioner to the class of defendants covered by the new statute. This reasoning applies with equal force to the instant case.

## B. *Retroactivity*

Appellant next makes the related claim that 18 Pa.C.S.A. § 1311 "may not be retroactively applied to crimes committed prior to its effective date," citing only 1 Pa.C.S.A. § 1926 of the Statutory Construction Act, and *Commonwealth v. McKenna*, 476 Pa. 428, 439–40 n.13, 383 A.2d 174 180 n.13. Section 1926 indeed codifies the presumption that statutes are not to be construed retroactively unless clearly and manifestly so intended by the legislature.

We need not concern ourselves, however, with § 1926 as there has been *no retroactive application* of the statute. Application of a sentencing procedure enacted in 1978 to a conviction rendered in 1979 *can in no way be viewed as retroactive.* Our courts have consistently held that "a statute does not operate retrospectively merely because some of the facts or conditions upon which its application depends came into existence prior to its enactment." *Gehris v. Pennsylvania Department of Transportation*, 471 Pa. 210, 215, 369 A.2d 1271, 1273 (1977); *Creighan v. Pittsburgh*, 389 Pa. 569, 132 A.2d 867 (1957).[18]

Appellant's reliance on *Commonwealth v. McKenna*, is not well founded. Note 13 of that opinion by Justice Pomeroy does state that the "provisions of this Act [the comparable Act of 1974] are not applicable to the McKenna trial because

18. Moreover, as noted in the previous section, it was only the sentencing procedure which had been declared unconstitutional by *Moody*. Even *Commonwealth v. McKenna, supra*, held that the death penalty permissible under 18 Pa.C.S.A. § 1102 could not be imposed in the absence of *any* valid sentencing guidelines and procedure. Thus, appellant does not and cannot argue that the death penalty *itself* is being applied retroactively. *See* note 17, *supra*.

the homicide occurred in the year 1973, long prior to the effective date of the Sentencing Code." 476 Pa. 428 at 439–40 n.13, 383 A.2d 174, 180 n.13. However, this gratuitous statement is eminently distinguishable from the case at bar.

Justice Pomeroy was merely referring to the Act of 1974 as an indication of the importance of capital punishment cases in order to justify the holding that, despite McKenna's failure to contest the death penalty, this Court would nevertheless address the obvious constitutional problems in that case. There was no issue there as to whether or not the Act of 1974 should be applied and the statement in note 13 was, therefore, truly gratuitous regards retroactivity and without precedential value.

## C. *Alleged Chilling Effect of Appellate Rights*

Appellant asserts "[s]ince no valid death penalty provision was then in effect [referring to the interim period between *Moody* and enactment of the new 18 Pa.C.S.A. § 1311] the *Moody* decision clearly granted appellant the option of abandoning his appeal from his conviction and, pursuant to *Moody*, vacating his sentence of death and replacing it with one of life imprisonment." Brief for Appellant at 18. Because of this, appellant maintains that his appellate rights were somehow "chilled". We fail to see the logic of this argument. It is incongruous to suggest that Story's appellate rights were "chilled" when he in fact vigorously pursued the appeal *and won a reversal of his conviction.*

In *Chaffin v. Stynchombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973), the petitioner was convicted of a capital offense and was sentenced by a jury to a prison term of 15 years. On a federal habeas corpus petition, the district court granted him relief, vacated sentence, and ordered the case returned to the Georgia State Court for retrial.

On retrial, petitioner was again convicted and the jury this time sentenced him to life imprisonment. Petitioner asserted that the possibility of a harsher sentence on retrial, even in the absence of a claim of prosecutorial vindictiveness (no such claim is made in the instant case), has an "imper-

missible chilling effect" on the exercise of his rights to appeal. The Court disagreed.

"The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow.... Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose."

Id. at 32, 93 S.Ct. at 1985, quoting Crampton v. Ohio, 402 U.S. 183, 213, 91 S.Ct. 1454, 1470, 28 L.Ed.2d 711 (1971).

The Court determined that the choice required in Georgia, (i.e., appeal and take the chance of a more stringent sentence on retrial or fail to appeal and stick with the original sentence) was not forbidden by the constitution. A state may legitimately require the accused to choose whether to accept the risk of a higher sentence or to waive his rights. Id. at 32–33, 93 S.Ct. at 1985–86. The Court further noted:

Petitioner was not himself "chilled" in the exercise of his right to appeal by the possibility of a higher sentence on retrial and we doubt that the "chill factor" will often be a deterrent of any significance. Unlike the guilty-plea situation and, to a lesser extent, the nonbifurcated capital trial, the likelihood of actually receiving a harsher sentence is quite remote at the time a convicted defendant begins to weigh the question whether he will appeal. Several contingencies must coalesce. First, his appeal must succeed. Second, it must result in an order remanding the case for retrial rather than dismissing outright. Third, the prosecutor must again make the decision to prosecute and the accused must again select trial by jury rather than securing a bench trial or negotiating a plea. Finally, the jury must again convict and then ultimately the jury or the judge must arrive at a harsher sentence in circumstances devoid of a genuine likelihood of vindictiveness. While it may not be wholly unrealistic for a convicted defendant to anticipate the occurrence of each of these events, especially in the infrequent case in which his claim

for reversal is strong and his first sentence was unusually low, we cannot agree with petitioner that such speculative prospects interfere with the right to make a free choice whether to appeal.

*Id.* at 33–35, 93 S.Ct. at 1986–1987. The choice occasioned by the possibility of a harsher sentence, even where that choice may in fact be quite "difficult," does not place an impermissible burden on the right of a criminal defendant to appeal or attack collaterally his conviction.

We agree with *Chaffin* that any asserted "chilling effect on appellate rights" (here, we are actually speaking of the right to withdraw an appeal) is too tenuous and speculative to be forbidden by the Constitution.

*Commonwealth v. Littlejohn*, 433 Pa. 336, 250 A.2d 811 (1969) does not require an opposite result. *Littlejohn* involved two cases wherein the appellants had *actually* failed to exercise their rights to appeal because of their fear of receiving the death penalty on retrial as opposed to the sentences of *life imprisonment* that had been imposed by the respective juries. The differences between *Littlejohn* and Stanton Story's situation are apparent. Story's appellate rights were not "chilled" in any fashion, nor, as he received the death sentence on both occasions, was he exposed to a risk of a harsher penalty than that meted-out at the first proceeding.[19]

## D. *Burden of Proving Mitigating Circumstances*

Appellant claims that placing upon the defendant the burden of proving mitigating circumstances by a preponderance of the evidence at the sentencing stage of his trial, 18 Pa.C.S.A. § 1311(c)(1)(iii), is violative of his due process rights under the Fourteenth Amendment, relying on *Mulla-*

19. We express no opinion on the continuing vitality of *Littlejohn* in light of the pronouncements of the United States Supreme Court in *Chaffin v. Stynchome, supra,* and *Dobbert v. Florida, supra,* 432 U.S. at 301, 97 S.Ct. at 2302 (rejecting an equal protection argument against sentencing to death penalty under a newly enacted procedure whereas those prisoners who had already been sentenced under old unconstitutional procedures had their sentences commuted to life).

*ney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) and *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

Those cases dealt with the allocations of burdens of proof at the *guilt stage* of the proceedings to prove elements of the crime charged, and so are of dubious precedential value in the instant case. Decisions of this Court and of the United States Supreme Court have expressed approval of the allocation of the burden of proving mitigating circum-- stances at the sentencing procedure upon the accused, so long as the prosecution has established its burden of proving that the crime falls into one of the categories for which the death penalty is appropriate. *Commonwealth v. Moody, supra*, 476 Pa. at 237, 382 A.2d at 449, stated:

[I]n our view, in order to protect a defendant from cruel and unusual punishment in a capital case, it is now neces- sary both that the aggravating circumstances that will justify the imposition of the death penalty be clearly defined for the sentencing authority, and that the sentenc- ing authority be allowed to consider *whatever mitigating evidence relevant to his character and record the defend- ant can present.*

*Lockett v. Ohio, supra*, 438 U.S. at 604, 98 S.Ct. at 2964, held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense *that the defendant proffers as a basis for a sentence less than death.*"

Additionally, assuming arguendo that *Mullaney* and *Pat- terson* would apply, they would not prohibit the placing of the burden on the defendant to establish mitigating circum- stances. As the Court noted in *Patterson*, even at the guilt stage, the mere recognition of a mitigating circumstance (i.e., a true *affirmative* defense to guilt as opposed to the *Mullaney* situation wherein the defendant had been required to negate what was actually an element of the crime) does not require the state to prove its nonexistence. 432 U.S. at 209–10, 97 S.Ct. at 2326–27.

Under 18 Pa.C.S.A. § 1311, the Commonwealth, by proving guilt beyond a reasonable doubt of murder of the first degree and of the existence of one or more aggravating circumstances (specified by subsection (d)), has demonstrated all that is constitutionally required of them under the scheme adopted by the legislature. It is the existence of *those* facts which the legislature has determined should mandate the death penalty *unless* the accused can prove (only by a preponderance) that there are reasons (specified in subsection (e)) why that sentence should be commuted to life. The burden of proof is fairly, and legitimately, allocated.

E. *Exclusion of Jurors for Cause Under Witherspoon v. Illinois*

Appellant here argues that the jurors excluded for cause because of their opposition to the death penalty were excluded on a broader basis than that permitted by *Witherspoon v. Illinois, supra.* Of the five jurors so excluded, appellant points to only one as possibly violating the *Witherspoon* standards (set forth in section I of this opinion).[20] Appellant's brief states at 20–21:

> In particular, the exclusion for cause of Ms. Stadnik [N.T. 487] was in direct violation of *Witherspoon.* During the course of her examination, Ms. Stadnik stated, "I don't believe in people having to die," [N.T. 486] and, "I don't think I would want to see anybody executed," [N.T. 487] and reiterated twice that she did not "like capital punishment." [N.T. 486, 487.] When the court asked whether her scruples would prevent her from returning a death sentence under any circumstances, she responded, "I guess I would sort of go against it. I wouldn't like to see them—" [N.T. 487] At most, these statements indicate that Ms. Stadnik did not "believe in" capital punishment and she had "a fixed opinion" against it.

**20.** We have examined the voir dire testimony of the other four and have found their exclusions to fit exactly within the ambit of *Witherspoon.*

Appellant does not recite the entire story. Judge Ross' opinion denying post-verdict relief on this issue completes the picture:

Prospective juror Stadnik was not excluded simply because she stated that she didn't "believe in people having to die" and that she didn't "like capital punishment," as defendant asserted (T.T. 486). Rather, this Court questioned her further to ascertain her ability to consider the death penalty:

THE COURT: If you were chosen to sit on this jury ... and ... reached a verdict ... that the defendant was guilty of murder in the first degree, then ... you and your fellow jurors then must make a decision as to whether or not the defendant should suffer life imprisonment or he should suffer death as prescribed by law. Now what we're asking you is, could you make that decision?

MS. STADNIK: *No.* I wouldn't object to the life imprisonment, but I don't like capital punishment.

THE COURT: It's not whether you like it ... The question is could you make that decision or is there something ... that would prevent you under any circumstances from returning a verdict of death ...?

MS. STADNIK: I guess I would sort of go against it. I wouldn't like to see them—

(T.T. 486–87).

BY MR. SCHWARTZ:

Q: ... Can you imagine the most horrible of crimes which was totally uncalled for that would justify you saying yes, that man should be executed?

A: I don't think I would want to see anybody executed. I would like to see them punished. Does that answer it?

(T.T. 487).

Clearly, this was not a general objection to the death penalty which was condemned in *Witherspoon* ; rather, Ms. Stadnik evinced total opposition to the death penalty so as to prevent an impartial decision as to the defendant's *guilt. Witherspoon, supra,* [88 S.Ct.] at 177 [1777] n.21.

The absence of neutrality in this situation is clear when viewed in context of the venireman's complete responses. Thus, the court found the defendant's allegation, that it was error to strike this prospective juror for cause, was without merit.

Lower court opinion at 12–13. The court did not err in so ruling.

## F. *Cruel and Unusual Punishment Due to Allocation of Burden of Proof*

This argument is reprinted in its entirety:

18 Pa. C.S.A. § 1311 is in violation of the Cruel and Unusual Punishment Clauses of the state and federal constitutions because it expressly provides that the jury's "verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance." This mandatory rule combined with the allocation to the defendant of the burden of proving mitigating circumstances, *see* Argument VIII, *supra,* prevents the jury from "giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proferred in mitigation." *Lockett v. Ohio,* 438 U.S. 586, 606, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (Plurality opinion of Burger, C. J.) For example, if the jury believed there was a significant probability that defendant's "participation in the homicidal act was relatively minor", § 1311(e)(7), but were not convinced of that fact by a "preponderance of the evidence," § 1311(c)(1)(iii), they would be precluded under the statute from deciding that life imprisonment rather than death should be imposed because of their doubt as to the degree of the defendant's participation in the crime. This is in violation of the Cruel and Unusual Punishment clauses of the state and federal constitution.

Appellant's "example" is absurd, for a jury's finding that a "significant probability" that a particular fact were true would surely satisfy it that defendant had met his burden,

especially in light of the court's instruction that a preponderance of the evidence exists when one side is "more believable" than the other side. N.T. 1881. We have already discussed the general issue regarding the allocation of the burden of proving mitigating circumstances.

## III. REVIEW OF DEATH SENTENCE

The Sentencing Code provides, 18 Pa.C.S.A. § 1311(h):

Review of death sentence.—

(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

(3) *The Supreme Court shall affirm the sentence of death unless it determines that* :

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

Appellant has not contended at any stage of these proceedings that the sentence of death should be vacated on the basis of any of the three enumerated grounds of § 1311(h)(3). Nevertheless, we note that there is absolutely no evidence in the record that the sentence of death was the product of passion, prejudice or some other arbitrary factor. § 1311(h)(3)(i). And, quite clearly, the evidence supports the finding of the aggravating circumstance of killing a peace officer while in the performance of his duty. § 1311(h)(3)(ii) (the aggravating circumstance was that specified in § 1311(d)(1).). As to the excessiveness or disproportionality of the penalty when compared to "similar

cases", § 1311(h)(3)(iii), the Pennsylvania experience is simply too brief to permit comparison. As noted, this is a case of first impression in this Court. There is nothing in the record or yet in the experience of our courts to suggest that the sentence is excessive or disproportionate to the penalty imposed in similar cases.

For the foregoing reasons, by the mandate of § 1311(h)(2), this Court affirms the sentence of death.

Judgment of sentence affirmed.

Verdict of death affirmed.

The foregoing being more attuned to the will of the people as expressed in the statute of the General Assembly, I must respectfully dissent.

FLAHERTY and KAUFFMAN, JJ., join in this dissenting opinion.

## APPENDIX

§ 9711. Sentencing procedure for murder of the first degree

(a) Procedure in jury trials.—

(1) After a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment.

(2) In the sentencing hearing, evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e). Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

(3) After the presentation of evidence, the court shall permit counsel to present argument for or against the sentence of death. The court shall then instruct the jury in accordance with subsection (c).

(4) Failure of the jury to unanimously agree upon a sentence shall not impeach or in any way affect the guilty verdict previously recorded.

(b) Procedure in nonjury trials and guilty pleas.—If the defendant has waived a jury trial or pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose unless waived by the defendant with the consent of the Commonwealth, in which case the trial judge shall hear the evidence and determine the penalty in the same manner as would a jury.

(c) Instructions to jury.—

(1) Before the jury retires to consider the sentencing verdict, the court shall instruct the jury on the following matters:

(i) the aggravating circumstances specified in subsection (d) as to which there is some evidence.

(ii) the mitigating circumstances specified in subsection (e) as to which there is some evidence.

(iii) aggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt; mitigating circumstances must be proved by the defendant by a preponderance of the evidence.

(iv) the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

(v) the court may, in its discretion, discharge the jury if it is of the opinion that further deliberation will not result in a unanimous agreement as to the sentence, in which case the court shall sentence the defendant to life imprisonment.

(2) The court shall instruct the jury on any other matter that may be just and proper under the circumstances.

(d) Aggravating circumstances.—Aggravating circumstances shall be limited to the following:

(1) The victim was a fireman, peace officer or public servant concerned in official detention as defined in 18 Pa.C.S. § 5121 (relating to escape), who was killed in the performance of his duties.

(2) The defendant paid or was paid by another person or had contracted to pay or be paid by another person or has conspired to pay or be paid by another person for the killing of the victim.

(3) The victim was being held by the defendant for ransom or reward, or as a shield or hostage.

(4) The death of the victim occurred while defendant was engaged in the hijacking of an aircraft.

(5) The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses.

(6) The defendant committed a killing while in the perpetration of a felony.

(7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

(8) The offense was committed by means of torture.

(9) The defendant has a significant history of felony convictions involving the use or threat of violence to the person.

(10) The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

(e) Mitigating circumstances.—Mitigating circumstances shall include the following:

(1) The defendant has no significant history of prior criminal convictions.

(2) The defendant was under the influence of extreme mental or emotional disturbance.

(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(4) The age of the defendant at the time of the crime.

(5) The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa.C.S. § 309 (relating to duress), or acted under the substantial domination of another person.

(6) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts.

(7) The defendant's participation in the homicidal act was relatively minor.

(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

(f) Sentencing verdict by the jury.—

(1) After hearing all the evidence and receiving the instructions from the court, the jury shall deliberate and render a sentencing verdict. In rendering the verdict, if the sentence is death, the jury shall set forth in such form as designated by the court the findings upon which the sentence is based.

(2) Based upon these findings, the jury shall set forth in writing whether the sentence is death or life imprisonment.

(g) Recording sentencing verdict.—Whenever the jury shall agree upon a sentencing verdict, it shall be received and recorded by the court. The court shall thereafter impose upon the defendant the sentence fixed by the jury.

(h) Review of death sentence.—

(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

(i) Record of death sentence to Governor.—Where a sentence of death is upheld by the Supreme Court, the prothonotary of the Supreme Court shall transmit to the Governor a full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court.