

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-27-1994

# Story v. Kindt, et al.

Precedential or Non-Precedential:

Docket 92-3586

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Story v. Kindt, et al." (1994). *1994 Decisions.* Paper 29.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/29

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 92-3586
_____


STANTON T. STORY,

Appellant

v.

WARDEN TOM KINDT;
ATTORNEY GENERAL PREATE

WARDEN TOM KINDT,

Appellee
_____

On Appeal From the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 92-00281)
_____


Argued: February 15, 1994

Before:  BECKER, HUTCHINSON and COWEN, Circuit Judges.

(Filed  May 27, l994 )



THOMAS S. WHITE
Federal Public Defender
W. PENN HACKNEY, First. Asst.
Federal Public Defender
MICHAEL D. BARTKO (Argued)
Asst.                    Federal
Public Defender

415 Convention Tower
960 Penn Avenue
Pittsburgh, PA   15222

Attorneys for Appellant

ROBERT E. COLVILLE
District Attorney
KEMAL ALEXANDER MERICLI
Assistant District Attorney
THOMAS N. FARRELL (Argued)
Assistant District Attorney
401 Allegheny County Courthouse
Pittsburgh, PA   15219-2489

Attorneys for Appellees

---

**OPINION OF THE COURT**

---

BECKER, Circuit Judge.

This is an appeal by Stanton T. Story from an order of the United States District Court for the Western District of Pennsylvania denying his petition for a writ of habeas corpus on the ground that he had failed to exhaust available state court remedies.  Story contends that we must excuse the exhaustion requirement because the nine-year delay in his post-conviction collateral proceedings in the Court of Common Pleas of Allegheny County was inordinate.  We agree.  We therefore reverse the order of the district court and remand the case for consideration of Story's habeas petition on the merits.  In doing so we note that it seems likely that Story would not have suffered this delay had the Court of Common Pleas maintained a central docket sheet for each criminal case rather than a system which merely lists entries in the order of their filing.  This method makes it difficult to determine whether or when a particular order was

2

filed, and we urge that the Court to remedy the deficiency so as to avoid similar delays in the future.

## I. **PROCEDURAL HISTORY**

### A. The Underlying Conviction

In October 1979, Story was convicted for the first degree murder of Police Officer Patrick Wallace and sentenced to death. Story appealed his conviction and sentence to the Supreme Court of Pennsylvania, which affirmed the judgment of conviction but vacated the death sentence and imposed a sentence of life imprisonment. Commonwealth v. Story, 440 A.2d 488 (Pa. 1981).[0]

### B. State Collateral Proceedings

In July 1983, Story, acting pro se, sought post conviction collateral relief in the Court of Common Pleas of Allegheny County pursuant to Pennsylvania's Post Conviction

---

[0]  Story was indicted in November of 1974. In March 1975, a jury found him guilty of murder in the first degree and fixed his sentence at death. On direct appeal, the Supreme Court of Pennsylvania reversed the conviction and remanded the case for a new trial. Commonwealth v. Story, 383 A.2d 155, 169 (Pa. 1978). The death penalty statute under which Story had initially been sentenced in 1975 was declared unconstitutional in 1977 in Commonwealth v. Moody, 382 A.2d 442, 443 (Pa. 1977). Thereafter, in September of 1978, Pennsylvania enacted a new death penalty statute. The Supreme Court ultimately determined that Story's second death sentence could not stand, having been based on a statute not in existence at the time of the crime. Story, 440 A.2d at 489-91.

3

Hearing Act ("PCHA"), 42 Pa. C.S. § 9501-9543.[0]  The Court appointed Jack Conflenti of the Allegheny County Public Defender's Office to represent him.  Although ordered to file an amended petition on Story's behalf, Conflenti failed to do so. As a result, on February 10, 1984, the pro se petition was denied without a hearing.

Story appealed the denial of PCHA relief to the Superior Court of Pennsylvania.  On April 19, 1985, that court vacated the trial court's judgment and remanded the matter for appointment of new counsel and other necessary proceedings. On June 5, 1985, the Court of Common Pleas appointed George C. Entenman to pursue Story's collateral claims by filing an amended PCHA petition.  According to Story, he attempted to contact Entenman on several occasions to urge the filing of an amended petition, and even sent family members to Entenman's office for the same purpose, but Entenman failed to comply with the Court's order.

Nearly eleven years after Conflenti failed to file an amended petition, and nearly nine years after Entenman failed to act as well, Story's PCHA petition remains in the Court of Common Pleas.  The only activity on Story's petition since June 5, 1985, has been the recent appointment of his third PCHA attorney (Jerome DeRiso) on February 24, 1993, and the filing of an amended petition a year later on February 14, 1994.

C.  The Federal Habeas Proceedings

---

[0]  The PCHA was amended in 1988, and is now known as the Post Conviction Relief Act ("PCRA").  See 42 Pa. C.S. § 9541.

In February 1992, Story filed a pro se petition for a writ of habeas corpus, 28 U.S.C. § 2254, which eventually reached the District Court for the Western District of Pennsylvania.[0] In addition to raising three substantive claims,[0] Story's habeas petition related his inability to contact Entenman and his frustration that, after several years, there had been no disposition on his PCHA petition. The Commonwealth filed a response in which it asserted that the habeas petition should be denied for failure to exhaust all claims therein or, in any event, because the claims were without merit.

The matter was referred to a magistrate judge who, despite Story's revelations of state court delay, recommended that the district court dismiss the petition for failure to exhaust state court remedies.[0] Story filed objections, in which

---

[0]  Story had been transferred to a federal penitentiary in Indiana, apparently pursuant to a federal-state agreement for housing of prisoners, and he initially filed the petition in December, 1991 in the United States District Court for the Southern District of Indiana. On December 31, 1991, the Indiana federal district court transferred the case to the United States District Court for the Eastern District of Pennsylvania which, on February 12, 1992, transferred the case to the United States District Court for the Western District of Pennsylvania (by that time Story had been retransferred to a Pennsylvania state prison).

[0]  These are: 1) ineffective assistance of counsel at trial; 2) unconstitutional selection of a death qualified jury; and 3) error by the Supreme Court of Pennsylvania in imposing a life sentence rather than remanding the case for resentencing.

[0]  Specifically, the Magistrate Judge's Report and Recommendation found that only Story's second claim (improperly impaneled jury) had been exhausted, thereby rendering the habeas petition a "mixed petition" which required dismissal. See Rose v. Lundy, 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982) (district court must dismiss a habeas petition containing both exhausted and unexhausted claims which raise a colorable claim of denial of a federal right).

5

he again asserted that, under the circumstances, the state process was ineffective to protect his rights, and that, in accord with 28 U.S.C. § 2254(b),[0] it would be futile to require him to exhaust his state remedies. By order entered September 17, 1992, the district court adopted the magistrate judge's Report and Recommendation, dismissed the petition, and denied Story's request for the issuance of a certificate of probable cause.

Story timely appealed, again seeking the issuance of a certificate of probable cause. A motions panel of this Court found probable cause to appeal and issued the certificate on May 28, 1993.[0] Since this is an appeal from a final order dismissing Story's pro se petition for writ of habeas corpus, we have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the district court's determination that state remedies have not been exhausted and should not be excused. Hankins v. Fulcomer, 941 F.2d 246, 249 (3d Cir. 1991).

## II. EXHAUSTION OF STATE REMEDIES

---

[0] 28 U.S.C. §2254(b) provides:

> (b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

[0] Pursuant to our issuance of the certificate, the Clerk of this Court appointed the Federal Public Defender's Office to represent Story on appeal.

6

Generally, a state prisoner seeking federal habeas relief must present each of his claims to the state's highest court.  See Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971); Rose v. Lundy, 455 U.S. 509, 515, 102 S.Ct. 1198, 1201, 71 L.Ed.2d 379 (1982).  However, exhaustion is not jurisdictional, but a matter of comity.  See Id. at 515, 102 S.Ct. at 1201.  The federal courts need not defer to the state judicial process when no appropriate remedy exists at the state level or when the state process would frustrate the use of an available remedy.  See 28 U.S.C. § 2254(b); Hankins, 941 F.2d at 249.

We observed in Wojtczak v. Fulcomer, 800 F.2d 353, 354 (3d Cir. 1986) that "inexcusable or inordinate delay by the state in processing claims for relief may render the state remedy effectively unavailable," thereby prompting the federal court to excuse exhaustion.  Although the existence of an inordinate delay does not automatically excuse exhaustion, it does shift the burden to the state to demonstrate why exhaustion should still be required -- a burden that is difficult to meet.  See Burkett v. Cunningham, 826 F.2d 1208, 1218 (3d Cir. 1987), cert. denied, 112 S. Ct. 3055, 120 L. Ed.2d 921 (1992); Wojtczak, 800 F.2d at 355.

In Wojtczak, for example, we dealt with a 33-month delay in deciding post-conviction petition, finding it sufficient to excuse exhaustion.  Id. at 356.  We have also found delays of eleven, five, twelve and three years sufficient to excuse exhaustion.  See Hankins, 941 F.2d at 247 (eleven years to decide motion to withdraw guilty plea sufficient to excuse exhaustion

7

requirement); Burkett, 826 F.2d at 1218 (five year delay sufficient to excuse exhaustion); Codispoti v. Howard, 589 F.2d 135, 142 (3d Cir. 1978) (twelve years to decide new trial motion); United States ex rel. Senk v. Brierley, 471 F.2d 657, 660 (3d Cir. 1973) (three year delay in deciding PCHA petition); see also United States ex rel. Geisler v. Walters, 510 F.2d 887, 893 (3d Cir. 1975) (stating in dicta that three years and four months to decide motion for new trial was inordinate delay sufficient to obviate the exhaustion requirement).

Story has demonstrated, and the Commonwealth has not denied, that he has suffered significant delay at the hands of the Court of Common Pleas for Allegheny County. The Commonwealth maintains, however, that its interest in deciding in the first instance issues raised concerning the prosecution of an alleged murderer, especially one who killed a state law enforcement officer, outweighs any delay he has suffered. The Commonwealth also claims that any delay was due to Story's own failure to alert the Court of Common Pleas that the court had not yet ruled on his PCHA petition.[0] Finally, the Commonwealth points to the recent progress on Story's PCHA petition, and urges this Court to defer to the state process.

---

[0] The Commonwealth contends, among other things, that Story should have filed another pro se petition in the Court of Common Pleas for Allegheny County. To the extent that his several previous encounters with appointed counsel and the court proved futile, however, we find Story's failure to pursue a new petition quite understandable. After all, "'it is the legal issues that are to be exhausted, not the petitioner.'" Burkett, 826 F.2d at 1218 (quoting Walters, 510 F.2d at 893).

We find the facts in this case to be as egregious as those in the cases cited above. During the nearly eleven years of his PCHA proceedings, Story has had three court-appointed attorneys, two who failed to comply with a Court of Common Pleas order to file an amended petition on Story's behalf, and one (the most recent) who took nearly a year to comply with a similar order. More importantly, however, the Court of Common Pleas neglected Story's case for almost eight years, apparently because of what appears to be seriously deficient docket management procedures, see infra, taking action only after it received notice of Story's federal petition.

We find it wholly untenable to penalize Story for his attorneys' failures and the Court of Common Pleas' inability to manage its own docket. Nor do we consider recent progress on Story's PCHA petition sufficient to require him to afford the state's courts three more years,[0] in addition to the nearly nine already consumed.[0] The Commonwealth simply has not met its burden to show why, in light of its inordinate and inexcusable delay, we should not excuse exhaustion. We will therefore reverse the order dismissing the habeas petition and remand the

---

[0] Three years is the amount of time counsel estimated at oral argument that it would take to complete the state proceedings, including an appeal to the Pennsylvania Superior Court and resolution of a petition for allocatur to the Pennsylvania Supreme Court.

[0] See Burkett, 826 F.2d at 1218 & n.31 (excusing exhaustion upon finding that petitioner's claims had been delayed long enough, regardless of the fact that state court proceedings had shown recent advancement); Wojtczak, 800 F.2d at 356 & n.3 (excusing exhaustion because of delay even where cause of delay had been remedied).

9

case to the district court with directions to entertain Story's petition on the merits.

### III.  THE ALLEGHENY COUNTY DOCKETING SYSTEM

When we searched for some reasonable explanation for the Court's failure to act on Story's PCHA petition for such a lengthy period of time, we concluded that the monumental delay was, in large part, the result of serious deficiencies in the Court's docketing system.  For some reason, the Court of Common Pleas of Allegheny County maintains no running (contemporaneous) central docket sheets for work in process on any criminal case before it.

Before 1978, court personnel apparently recorded all filings and orders from all cases in a series of ledgers.  The ledger entries appeared in chronological order of their happening.  However, on any given day, the ledgers might have reflected several unrelated occurrences in several unrelated cases.  Thus, it was nearly impossible for someone, including the court, to array in one place the proceedings of any particular case without expending considerable effort rummaging through each page of the ledgers.  Although the court computerized the ledger system in 1978, computerization did not remedy the problem; the court still does not create a running central docket sheet for each criminal case until the case is appealed to the Superior Court of Pennsylvania, and so there is no convenient source which reflects the filings that have occurred in a particular case.

10

As a result of this system, there was never a public record created to summarize the events in Story's collateral proceeding.  Nor was there a convenient method by which the presiding judge could monitor the progress of Story's case, independent of the judge's own recordkeeping.  There was simply no way of knowing the status of a case without scanning the computer files by entering the defendant's name, state offense tracking number (OTN), or the information (docket) number.  The cumbersome nature of these methods apparently caused the court to overlook Story's pending proceeding.

We are surprised that a court with such a distinguished history as the Court of Common Pleas for Allegheny County lacks a central docket sheet system capable of monitoring work in progress on each criminal case.  We believe that the absence of such a system contributed to the terrible delay of nearly nine years that we observe here.[0]  We urge the Court of Common Pleas to upgrade its docketing system.

The order of the district court dismissing Story's federal habeas petition will be reversed and the case remanded to the district court for consideration of the petition on the merits.[0]

---

[0]  It also created a good deal of confusion in the proceedings before this Court because neither party could state with any certainty whether the Court of Common Pleas ever appointed attorney Entenman to represent Story.

[0].  We do not engage the dissent's discussion of the merits, and intimate no view as to its correctness vel non except to note that we do not believe the dissent's analysis and conclusion to be free from doubt.  At all events, we believe it preferable for the merits to be addressed by the district court in the first instance.

Story v. Kindt, No. 92-3586

COWEN, Circuit Judge, dissenting.


    I agree with the majority that the inordinate delay in this case operates excuse the exhaustion requirement, and join the opinion of the court to this extent However, I cannot join in the judgment of the court to remand the case for the dist court to address the merits of the petition. I believe once the exhaustion require excused, we should also proceed to address the merits of the petition to the extent possible, particularly where, as here, our decision on any one issue would be dispo of the petition. Petitioner Story argues, inter alia, that the state selected a de qualified jury[0] to try him when, in fact, he was not eligible for capital punishmen thereby violating his Sixth Amendment right to be tried by an impartial jury. This strictly a legal question which has been briefed and argued before us. We need no information in order to adjudicate the matter. I would proceed to decide the quest favor of Story, and grant the petition conditioned on Story's not being retried bef non-death-qualified jury within a reasonable period of time. This would render his remaining claims moot.

---

[0] We previously explained the nature of such a jury:

> "Death qualification" refers to the exclusion of "the so-called `Witherspoon-excludable[s]'" from a jury panel. "Witherspoon-excludable, turn, refers to a prospective juror whose conscientious or religious scru toward the imposition of the death penalty would "`prevent or substantial impair the performance of his duties as a juror in accordance with his instructions and his oath.'"

United States v. Salamone, 800 F.2d 1216, 1219 n.6 (3d Cir. 1986) (citations omitte

2

The majority contends that it is preferable for the district court to add the merits in the first instance. Maj. Op. Typescript at 12 n.12. I respectfully disagree. As a general matter, a court of appeals does not remand purely legal que to the district court for the sole purpose of having the district court address the question in the first instance. We are as competent as the district courts in resol purely legal questions and thus do not need to remand with respect to such question although we almost invariably remand cases to the district courts for resolution fa disputes. Moreover, we do not exercise discretionary review powers as the Supreme does; we adjudicate appeals presented to us as a matter of right by the appellants are entitled to a decision. The nature of our authority carries with it a duty to adjudicate all matters as justice requires. We should not pick and choose among th questions properly presented to us when any of those questions is dispositive of ar appeal. Finally, a remand in this case adds delay to the long delay which the majo describes as "inordinate." Maj. Op. Typescript at 2. Story's quest for post-convi relief has already been a lengthy and tortuous process of 15 years since he was con for the second time in October 1979. Remanding the case to the district court like add another two or three years to the saga of delay before this case resurfaces to court because it will take time for the district court to schedule and to conduct a hearing on the ineffective assistance claim, and for us to process any future appea including the issuance of a certificate of probable cause. The district court migh be wasting its time in holding a hearing on the ineffective assistance claim if my analysis is accepted when the case comes up on appeal again. All this trouble is n necessary if the majority agrees with my analysis here. If one can find an example the truism that "justice delayed is justice denied," the majority's disposition to one.

I.

3

Story was tried and convicted in 1975 for first degree murder allegedly committed in July of 1974. He was sentenced to death. While his first appeal was pending, the death penalty statute pursuant to which he was sentenced to death was declared unconstitutional. Commonwealth v. Moody, 382 A.2d 442 (Pa. 1977), cert. d[...] 438 U.S. 914, 98 S. Ct. 3143 (1978). Story's conviction was reversed and he was gra[...] new trial because of the admission of improper and prejudicial evidence. Commonweal[...] Story, 383 A.2d 155 (Pa. 1978).

Before Story's retrial, the Pennsylvania legislature enacted a new death [...] statute, the Act of September 13, 1978 ("1978 Act"). There is a standing legislati[...] mandate in Pennsylvania that "no statute shall be construed to be retroactive unles[...] clearly and manifestly so intended by the General Assembly." 1 Pa. Cons. Stat. Ann[...] 1926 (Purdon Supp. 1993). The 1978 Act does not "clearly and manifestly" state tha[...] was to be applied retroactively. Section 2 of the 1978 Act states that "[t]his act[...] take effect immediately." This section indicates that the Act was to apply prospe[...] The same "[t]his Act shall take effect immediately" language in another death penal[...] statute had been interpreted in January of 1978 by the Pennsylvania Supreme Court a[...] indicating that the statute was meant to apply only prospectively, not retroactivel[...] conduct which took place before the enactment of the statute. Commonwealth v. McKen[...] A.2d 174, 180 n.13 (Pa. 1978) (interpreting Act of 1974, March 26, P.L. 213, No. 46[...] 6). See also Commonwealth v. Story, 440 A.2d 488, 489-91 (Pa. 1981). Accordingly, i[...] clear before the second trial that Story was not eligible for capital punishment pu[...] to the newly enacted Act of 1978 because he allegedly committed the offense in 1974[...]

[0]This case is different from Dobbert v. Florida, 432 U.S. 282, 292-301, 97 S. Ct. 2[...] 2298-302 (1977), where the Supreme Court held that the Constitution does not forbid[...] state from retroactively applying a new death sentence statute to a defendant who [...] committed a murder at the time when another death sentence statute was in effect, i[...] application were the choice of the state. Such was not the choice of Pennsylvania [...] case; the Pennsylvania legislature decided to apply its legislation only prospectiv[...] state court can only constitutionally try a defendant in accordance with the penalt[...] prescribed by the state legislature. Cf., e.g., McKenna, 383 A.2d at 183 ("[I]t wo[...]

Although Story was not a capital defendant in the second trial, the state

informed the state trial court that it intended to seek death penalty for Story, an

successfully sought over the objection of Story a death-qualified jury to retry Sto

The state trial court empaneled a death-qualified jury to retry Story in 1979.  He

convicted and sentenced to death under the Act of 1978.  On direct appeal the Penns

Supreme Court held that the Act of 1978 did not apply to Story's conduct, but did n

disturb the conviction; it merely reversed the death sentence and imposed a term of

imprisonment on Story.  Story, 440 A.2d at 489-92.  The Pennsylvania Supreme Court r

Story's argument relating to the death-qualified jury without discussion.  Id. at 4

## II.

The Sixth Amendment, applied through the Fourteenth Amendment to the stat

Duncan v. Louisiana, 391 U.S. 145, 147-58, 88 S. Ct. 1444, 1446-52 (1968), provides

part that "the accused shall enjoy the right to a speedy and public trial, by an im

jury of the State."  U.S. Const. amend. VI.  In constructing the Sixth Amendment, t

Supreme Court has ruled that in a capital case, a capital defendant may be tried be

death-qualified jury,  Lockhart v. McCree, 476 U.S. 162, 173-85, 106 S. Ct. 1758, 1

(1986), and that in joint trials part of which involved a capital crime, non-capita

defendants may be tried before a death-qualified jury together with capital defenda

Buchanan v. Kentucky, 483 U.S. 402, 414-25, 107 S. Ct. 2906, 2913-19 (1987).  The c

judice presents the question whether an individual non-capital defendant can be tri

alone before a death-qualified jury.  This question is markedly different from thos

presented in McCree and Buchanan.  I would answer that question in the negative.[0]

repugnant to any fair system of jurisprudence to knowingly permit a court to impose
sanction (regardless of its nature) that exceeds that tribunal's authority.") (Nix,
concurring).

[0]Teague v. Lane, 489 U.S. 288, 292-317, 109 S. Ct. 1060, 1065-78 (plurality opinion
prevents a federal court from granting habeas corpus relief to a state prisoner bas
new rule announced after the judgment of his conviction and sentence became final,

5

The "impartial jury" requirement under the Sixth Amendment has spawned a deal of debate and empirical studies.  See McCree, 476 U.S. at 167-73, 106 S. Ct. a 64. It is not necessary, however, to define the precise parameters of the impartial requirement.  It suffices to state that sociological studies on death-qualified jur cited in McCree, id., sufficiently demonstrate that death-qualified juries are prob and not impartial in the true sense of the term.  The Supreme Court "assume[d]" tha studies were "both methodologically valid and adequate to establish that `death qualification' in fact produces juries somewhat more `conviction-prone' than `non-c

that rule falls within the two narrow exceptions to the nonretroactivity principle. However, "a federal court may . . . decline to apply Teague if the State does not a it."  Caspari v. Bohlen, ___ U.S. ___, ___, 114 S. Ct. 948, 953 (1994).  In this ca state did not assert the Teague defense either before us or before the district cou thus, waived it.  Accordingly, I need not decide the implication of Teague.

In any event, I believe Story's argument that trying a non-capital defend before a death-qualified jury violated his Sixth Amendment right to a trial before impartial jury is based on a common sense understanding of the Amendment and the na the death qualification process, and is foreshadowed by Supreme Court cases which r compelling or significant interests to justify trying a defendant before a death-qu jury.  There is no need for a novel interpretation.  Thus, he is not seeking the be of a new rule.

Assuming that Story seeks to rely on a new rule, that rule falls within t second exception to the Teague rule because it is a watershed rule "implicating the fundamental fairness and accuracy of the criminal proceeding."  Saffle v. Parks, 49 484, 495, 110 S. Ct. 1257, 1263 (1990).  The proper functioning of the jury occupie importance place in our system of justice, and courts have zealously guarded it aga unlawful interference.  See, e.g., Sullivan v. Louisiana, ___ U.S. ___, 113 S. Ct. 2080-2083 (1993) (constitutionally defective reasonable doubt instruction cannot be harmless error); United States v. Pelullo, 14 F.3d 881, 887-97 (3d Cir. 1994) (coll estoppel cannot be applied against a criminal defendant to establish an element of crime).  But see Adams v. Aiken, 965 F.2d 1306, 1312 (4th Cir. 1992) (the rule invalidating constitutionally defective reasonable doubt instruction does not fall the second exception to the Teague nonretroactivity principle), cert. denied, ___ U ___, 113 S. Ct. 2966 (1993), cert. granted on reh'g and judgment vacated, ___ U.S. 114 S. Ct. 1365 (1994) (remanding the case to the Court of Appeals for the Fourth C for reconsideration in light of Sullivan v. Louisiana).

The impartiality of the judge and/or trier of facts is a basic component proceeding.  See Tumey v. Ohio, 273 U.S. 510, 532-34, 47 S. Ct. 437, 444-45 (trial potentially biased judge violated due process); Haupt v. Dillard, 17 F.3d 285, 287- Cir. 1994).  The impartiality of the jury which is the sole trier of facts and the of guilt in a criminal case, is more fundamental and more important.  The selection partial jury destroys any pretense of fairness in a proceeding.  See also infra at 1 (non-impartial and biased jury cannot be harmless).

6

qualified' juries."  Id. at 173, 106 S. Ct. at 1764.  In Buchanan, the Court again

that accumulated scholarly studies demonstrate that death-qualified juries are abno

prone to convict.  483 U.S. at 415 n.16, 107 S. Ct. at 2913 n.16 (citing McCree).

conviction-proneness even when infecting only some jurors comprising the jury bring

doubt the impartiality of the jury as a whole, not to mention when conviction-prone

facto serves as the sole criterion for the selection of the whole jury, as in the d

qualification process.  Accordingly, in a non-capital case, without more, death-qua

juries can be presumed not to be impartial juries within the meaning of the Sixth

Amendment.

Recognizing the serious problem with a death-qualified jury, the Supreme

has narrowly permitted such a jury to try a capital defendant, McCree, 476 U.S. at

106 S. Ct. at 1764-70, and to try a non-capital defendant together with a capital

defendant in a joint trial, Buchanan, 483 U.S. at 414-25, 107 S. Ct. at 2913-19.  T

Court was not without difficulty in permitting the use of death-qualified juries ev

these limited circumstances.  The Court went out of its way to justify the decision

each case by articulating compelling or significant state interests.

According to the Court, the state's decision to have a death-qualified ju

a capital defendant can be justified by two important state interests that such a j

serves: (1) to obtain a single jury that could impartially decide all of the issues

case (both the guilt phase and sentencing phase), and (2) to allow the defendant to

benefit at the sentencing phase of the trial from the jury's "residual doubts" abou

evidence presented at the guilt phase.  McCree, 476 U.S. at 180-81, 106 S. Ct. at 1

Of course, a state has a legitimate interest in not having a juror who is against t

death penalty sit on a jury whose duty includes administering the penalty of death.

non-capital defendants in joint trials with capital defendants, they may be tried b

7

death-qualified jury because of the strong state interest in having a joint trial.[0]
Buchanan, 483 U.S. at 418-20, 107 S. Ct. at 2914-16.  In a joint trial, the state u
McCree may empanel a death-qualified jury to try the capital defendant.

These justifications are completely absent in cases such as this where th
defendant was not eligible for capital punishment.  In such a case the Sixth Amendm
prohibits the use of a death-qualified jury because there is no valid reason for
empaneling such a jury.  As Justice Marshall stated in his dissent in Buchanan, "[i
conceded . . . and the Court's analysis today implicitly accepts, that the Sixth Am
would have prohibited death qualification had petitioner been tried alone."  Buchan
U.S. at 430, 107 S. Ct. at 2922 (Marshall, J., dissenting).

The state interests that motivated the holding in both McCree and Buchana
not present in this case.  By state legislation and case law, Story was ineligible
capital punishment.  See Part I of this dissent.  The state therefore had no legiti
interests that were sanctioned in McCree.  There was no co-defendant in this case a
therefore, the state cannot resort to the state interest in holding joint trials as
articulated in Buchanan.  Accordingly, the state had no legitimate interest in havi
Story tried before a death-qualified jury.  See also Middleton, 244 Cal. Rptr. at 3
do not believe . . . that there is any legitimate state interest that should compel
trial of a non-capital defendant over his or her objection (merely because there ar
defendants who are subject to capital punishment), by a `death qualified' jury wher
other reasonable alternative short of a severance is available and where such alter
is requested by the non-capital defendant.") (citation omitted).

---

[0]  Indeed, the reliance on the state interest in holding joint trials is not solid.
better alternative is to impanel a separate non-death-qualified jury to try the non
capital defendants simultaneously with the death-qualified jury that tries the capi
defendant, as suggested in California v. Middleton, 244 Cal. Rptr. 378, 396 (Cal. C
App.), review denied, id. (1988).  Separate juries for different defendants have be
employed in California and approved by its Supreme Court.  Id. n.25.  This approach
time and money and protects the rights of the defendants.  See Sometimes Two Juries
Better than One, N.Y. Times, Dec. 20, 1993, at D9.

8

I am aware of the language of the Supreme Court in McCree that "an impart

jury consists of nothing more than `jurors who will conscientiously apply the law a

find the facts.'" McCree, 476 U.S. at 178, 106 S. Ct. at 1767 (citation omitted) (

in Buchanan, 483 U.S. at 417, 107 S. Ct. at 2914). I note that this language was m

reject McCree's argument that he was entitled to a balanced jury. Id. It was not

to apply blindly to all situations. The Court itself did not seem to accord too mu

weight to its intimation. Indeed, if that language states the rule, the Court would

have had to go out of its way to justify the use of death-qualified juries by artic

compelling or significant state interests in McCree and Buchanan.

More important, if a death-qualified jury can be presumed to be convictic

prone, it is not one that "will conscientiously apply the law and find the facts,"

McCree, 476 U.S. at 178, 106 S. Ct. at 1767, in the true sense of that phrase. To

otherwise is to ignore the realities of life. We should not close our eyes to the

demonstrative inability of the conviction-prone, death-qualified jury to impartial]

decide guilt for the sole goal of adhering to the conclusion that even a convictior

jury can theoretically apply the law conscientiously. The conviction-proneness of

jurors disturbs many a jurist. Most recently, Justice O'Connor was persuaded to ac

permitting defendants, but not the state, to exercise peremptory challenges on the

of gender in order to prevent conviction-prone jurors from sitting on a jury (becau

women are more likely to convict in certain cases), although she agreed with the cc

that the government should not be allowed to do so. J.E.B. v. Alabama ex rel. T.B.

92-1239, 1994 WL 132232 (U.S. April 19, 1994), at *10-11 (O'Connor, J., concurring)

reason she gave was that constitutional prohibitions against discrimination apply o

state actors, and not to defendants who are private actors. Id. If we permit a de

qualified jury to try a non-capital defendant, neither the Constitution nor logic p

a non-arbitrary stopping point. We may have to permit death-qualified juries to tr

serious criminal cases. It would be repugnant to our system of justice if, for exa

9

we tried a defendant indicted for third degree criminal assault before a death-qual

jury.

IV.

One may ask whether Story was prejudiced by trial before a death-qualifie
Most constitutional trial errors are subject to a harmless error analysis.  See ge
Chapman v. California, 386 U.S. 18, 87 S. Ct. 824 (1967); Brecht v. Abrahamson, __
___, 113 S. Ct. 1710 (1993) (habeas case). Some structural errors, however, are no
Sullivan v. Louisiana, ___ U.S. ___, ___, 113 S. Ct. 2078, 2080-83 (1993)
(unconstitutional reasonable doubt instruction not subject to harmless error analys
but see Kontakis v. Beyer, No. 93-5178/5198, 1994 WL 73255, at *8-15 (3d Cir. Mar.
1994) (on habeas petition applying harmless error analysis to instructions that
unconstitutionally altered the state's burden to prove that the defendant killed hi
purposely).  The case sub judice is distinguishable from Kontakis because Story's a
is based on the partiality of the jury rather than defective jury instructions.

The Supreme Court has recognized the partiality of the trial judge as a
structural defect not amenable to harmless error analysis because such a problem
"affect[s] the framework within which the trial proceeds." Arizona v. Fulminante,
U.S. ___, ___, 111 S. Ct. 1246, 1265 (Rehnquist, C.J., delivering the opinion of th
Court) (citing Tumey v. Ohio, 273 U.S. 510, 47 S. Ct. 437 (1927)).  Similarly, and
to a greater extent, trying Story before a death-qualified jury, which was require
make the ultimate decision of whether to convict Story, affected the whole proceedi
defied any attempt to search for fairness in the defective trial process.  Cf. Davi
Georgia, 429 U.S. 122, 97 S. Ct. 399 (1976) (per curiam) (improper exclusion of jur
capital case constitutes reversible constitutional error per se); Gray v. Mississip
U.S. 648, 659-68, 107 S. Ct. 2045, 2052-57 (1987) (reaffirming Davis; improper excl
of juror in capital case not subject to harmless error analysis); Johnson v.  Zerbs

10

U.S. 458, 462, 58 S.Ct. 1019, 1022 (1938) ("The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will `still be done.'" (citation omitted)). Accordingly, trial before a death-qualified is a structural error that is not amenable to a harmless error analysis.

## IV.

For the foregoing reasons, I respectfully dissent from the judgment of the court. I would grant the petition conditioned upon Story's not being retried befor non-death-qualified jury within a reasonable time.

11